# United States Court of Appeals
## For the First Circuit

Nos. 07-2303
     07-2304
     07-2305
     07-2433

FRANCISCO MÉNDEZ-MATOS; FRANCISCO MÉNDEZ-AYALA,

Plaintiffs, Appellants/Cross-Appellees,

v.

MUNICIPALITY OF GUAYNABO; HONORABLE HÉCTOR O'NEILL, in
his personal and official capacity as Mayor of the
Municipality of Guaynabo; ALBA ALVELO DE O'NEILL;
CONJUGAL PARTNERSHIP O'NEILL-ALVELO

Defendants, Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jamie Pieras, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Roberto Busó-Aboy for appellants/cross-appellees.
Eliezer Aldarondo-Ortiz, with whom Claudio Aliff-Ortiz was on
brief, for appellees/cross-appellants.

February 24, 2009

**LIPEZ**, **Circuit Judge**.  The primary issue in this case involves an award of punitive damages by a Puerto Rico federal jury in an action pursuant to 42 U.S.C. § 1983, and the subsequent reduction of the award by the court.  Plaintiff challenges the reduction of the award.  Defendants challenge the award itself.

On November 26, 2004, Mayor Héctor O'Neill and the Guaynabo municipal police detained a construction crew working on the city's new government center.  Francisco Méndez-Ayala, supervisor of the crew, and Francisco Méndez-Matos, his father and the construction company's owner, brought suit against Mayor O'Neill and the police under 42 U.S.C. § 1983 and Article 1802 of the Puerto Rico Civil Code, claiming that their arrest was unlawful and caused them pain and suffering.  They prevailed at trial.  The jury awarded Méndez-Ayala $35,000 in compensatory damages under section 1983 and Article 1802 and $350,000 in punitive damages under section 1983.  It awarded Méndez-Matos $50,000 in compensatory damages under Article 1802.

Concluding that the punitive damages award violated due process limits articulated by the Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996), the district court reduced the punitive damages to $35,000.  Méndez-Ayala appeals this order.  Guaynabo and Mayor O'Neill cross-appeal, contending that Méndez-Ayala did not meet the threshold requirement for punitive damages, that his compensatory damage award was grossly excessive, and that

they are entitled to judgement as a matter of law on Méndez-Matos's Article 1802 claim, or at least a reduction in the damage award. Finding no error, we affirm.

## I.

When a party challenges the sufficiency of the evidence, "the court of appeals must take both the facts and the reasonable inferences therefrom in the light most hospitable to the jury's verdict." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1188 (1st Cir. 1995). We therefore state the facts as the jury reasonably could have found them.

### A. The Guaynabo-Comagro Contract

On December 7, 1999, the Municipality of Guaynabo awarded a contract for the construction of a new government center and adjoining parking facility to Comagro Special Partnership ("Comagro"), a general contractor owned and managed by Francisco Méndez-Matos ("Méndez-Matos"). As originally conceived, the government center project had a value of over $17 million dollars. It included plans for a nine-story tower with a mezzanine, a plaza, an amphitheater complex, above-ground parking and below-ground parking. On January 24, 2000, the parties signed the construction contract. The contract incorporated by reference the American Institute of Architects "General Conditions of the Contract for Construction" (the "AIA agreement"), which divided payment into two stages. First, at preset intervals during construction, Comagro

-3-

would receive "progress payments" after documenting its work to Guaynabo. Second, Guaynabo would withhold ten percent of the contract price (the "retainage") until the project was certified "substantially complete." A "certificate of substantial completion" would be awarded when an inspector determined that the facility was sufficiently complete that it could be transferred to Guaynabo and put to its intended use.

Construction began in early 2000, but progress was slow. The city repeatedly altered the design of the project, submitting at least thirty-eight "change orders" after January 2000. Those changes led to delays. In late October 2003, three years after signing, the parties amended the construction contract. Under the terms of the amended agreement, construction was divided into two phases, separating the parking facility from the rest of the project. The city's thirty-eight change orders were incorporated into the project's price, increasing the contract value by nearly fifteen percent, to over $20 million dollars. Delays continued even after the amendment. The design of important aspects of the government center remained incomplete. As of October 2003 Comagro still did not possess complete designs for the tower's air conditioning system, the plaza, and other aspects of the project. In some cases designs were not delivered until nearly one year later, in July 2004.

In February 2004, four months after the amended contract was signed, a dispute arose over the progress payments. Guaynabo asserted that it had overpaid Comagro by $1,300,000. City officials blamed Comagro, which had submitted payment certificates that included the cost of unused building materials. As they interpreted the AIA agreement, the city was not responsible for the cost of materials unincorporated into the structure. In response, Comagro claimed that the building materials had been properly included in the payment certificates, that the certificates had been approved by city officials, and that the materials remained unused only because of the many change orders and missing designs. By Comagro's calculation, there had been no overpayment. Nevertheless, Guaynabo officials began to make deductions from progress payments to account for the alleged error. Seeking the withheld monies, Comagro filed a request for arbitration on April 15, 2004.

On October 6, 2004, in the midst of this dispute, city project inspector Jamie Dávila ("Dávila") issued Comagro the certificate of substantial completion. Pursuant to the AIA agreement, Dávila included a so-called "punch list" with the certificate. The punch list specified minor problems with the project that Comagro was obligated to address before receiving final payment (such as the repair of cracks, the replacement of defective light fixtures, and cleaning). Comagro was given thirty

days to address the items on the list. In fact, Comagro had already corrected many of the problems on the punch list by the time the list was received. It immediately began to resolve those that remained.

However, on November 3 -- only a few days before the scheduled final inspection -- Guaynabo officials provided Comagro with a new punch list and claimed that some of the items on the first list had not yet been addressed. On November 15, Dávila sent a memo to Comagro asserting that deficiencies on the punch list had still not been corrected, and that the city was therefore withdrawing the certificate of substantial completion and imposing liquidated damages of $1,000 a day. In Comagro's response, also dated November 15, Méndez-Matos asserted that the construction contract did not allow for late additions to the punch list, nor for the withdrawal of the certificate of substantial completion. The letter characterized as a "total contradiction" the city's assertion that the building was now unusable for its intended purpose, when it had been judged usable only one month earlier. Guaynabo's conduct, it stated, was plainly retaliatory for Comagro's decision to file for arbitration. As evidence, the letter pointed to comments made by Mayor Héctor O'Neill ("the Mayor") at an October 21 meeting, in which the Mayor stated that a certificate of substantial completion should never have been granted because Comagro had filed for arbitration. Nevertheless,

-6-

the letter stated, Comagro would continue to prepare the project -- which was already complete -- for delivery.

Until this point, the Mayor's involvement with the government center project had been indirect. He had not seen the construction contract, the certificate of substantial completion, or its accompanying punch list. He had not inspected the project. Instead, he received reports on the status of the project from the public works director, who in turn relied on the city's legal division, its finances department, and the project inspector, Dávila. This team told the Mayor that the government center was severely delayed, that the city and Comagro were embroiled in a payment dispute, and that Comagro had filed for arbitration. At some point in the weeks before November 26, however, the Mayor began to personally inquire about the status of the project. He asked several city officials when the city would take possession of the building. He made multiple phone calls to the director of the legal division, asking "if the process for me to make use of the [government center] parking lot had concluded."

On November 18, the city sent a "default letter" to Comagro. The letter, on which the Mayor was briefed,[1] asserted that Comagro was in breach of the amended contract for

---

[1] The Mayor offered conflicting testimony on this point. See infra text accompanying note 11. Taking the facts in the light most hospitable to the verdict, we infer that he knew what the default letter stated by November 26.

construction.  The agreed-upon delivery date for the project, it stated, had been January 21, 2004; by this count, Comagro was late by 292 days.  Moreover, Comagro had failed to fix construction deficiencies identified on the punch list within the thirty-day deadline for doing so.  The letter concluded that Comagro was in default, demanded immediate delivery of the project, and reiterated Comagro's responsibility to "respond[] for any construction deficiency or defect, evident or hidden, which may be detected by the [city] at the project."[2]

Méndez-Matos told no one at Comagro about the default letter when he received it on November 24.  In his view, the termination effected by the default letter was unlawful, because

---

[2] The pertinent portions of the default letter read as follows:

1. Pursuant to the contractual breaches indicated, the MG [Municipality of Guaynabo] reiterates its declaration of default, wherefore it demands the immediate delivery of the project. COMAGRO must comply, likewise, with its obligation to facilitate to the MG the material possession of the Project and that it may continue with the completion of the work with each and every one of the existing subcontractors, and the materials, equipment, tools, construction equipment and machinery existing at the Project and belonging to said subcontractors or COMAGRO. . . .
4. This declaration of default does not release the contractor in any way or manner from its obligation to respond for itself or through its subcontractors and bonding agents to maintain in effect and valid all of the guarantees incidental to: (i) true and full completion of the construction contract . . . .
5. The termination of this Contract, does not release COMAGRO from responding for any construction deficiency or defect, evident or hidden, which may be detected by the MG at the project . . . .

the city had failed to follow the procedures required by the AIA agreement for termination of the general contractor.   More importantly, however, under the AIA agreement a terminated contractor was entitled to seven days notice before having to deliver a project to the owner.   Thus, on Friday, November 26, two days after Comagro received the default letter, it sent its employees to the government center to "correct construction deficiencies" and clean up, in preparation for delivery of the building.

**B. The Government Center Detainment**

The first Comagro employee to arrive at the construction site on November 26 was Victor Santiago ("Santiago"), the project foreman during the last two years of construction.   Ten workers arrived sometime later, around 7:00 a.m.   Using keys from the Comagro office, Santiago unlocked the project site and assigned the workers to tasks on the first floor of the parking facility, the fourth floor of the tower, the mezzanine, and the plaza.   Francisco Méndez-Ayala ("Méndez-Ayala"), the project supervisor and Méndez-Matos's son, arrived at the site around 8:00 a.m.   Méndez-Ayala went to the parking facility, where he supervised workers cleaning up and patching cracks in the concrete.   Sometime around 8:30 a.m., Santiago observed the Mayor talking on his cell phone outside the government center.   The Mayor circled the building, but did not enter.   Work continued until around 9:00 a.m., when the Comagro

workers took a fifteen-minute break. After the break, Méndez-Ayala returned to the first floor of the parking facility, where he was later joined by Santiago.

Around 9:30 a.m., Mayor O'Neill left his office in the old city hall and returned to the government center. As he approached the building's parking facility, he noticed that one of its rolling gates was open. Concerned about this, he called the city public works director, the director of operations, and project inspector Dávila, but reached none of them. He made no effort to contact Comagro or Méndez-Matos. At some point, however, the Mayor contacted the municipal police. Lieutenant Wilfredo Martinez, who was off duty at the time, was called to the scene, where he received orders from the Mayor to clear Comagro workers from the building, establish control of the three exits, and prevent anyone else from entering the building. Other officers arrived, including, at some point, both the police commissioner and the police commander. The Mayor then entered the parking facility through the open rolling gate, partially closing it behind him. Accompanying him were ten to fourteen police officers, some of them armed, several police motorcycles, and several "four-track" vehicles driven by police officers.

When Santiago and Méndez-Ayala saw the Mayor approach them in the parking facility, the Mayor appeared irate. He yelled that their work was "garbage," "shit," and that Comagro was "the

shittiest company he had seen in his life." He told the employees that they were all "fired," and that they should stop work and leave. Turning to officers in the four-track vehicles, he directed them to drive through cement freshly poured on the parking facility floor. Meanwhile, outside, additional patrol cars began to arrive and position themselves at the entrance to the parking facility. Taken aback, Méndez-Ayala asked the Mayor what was going on and why they should stop working. In response, Méndez-Ayala testified, the Mayor "changed his mind." Instead of removing the Comagro employees from the site, he detained them there:

> All of a sudden, he changed -- changed his mind. And I said, well, hey, wait a minute. What's going on? And I said -- I mean, I tried to talk with him to see, but then all of sudden he changed again and said we were all detained and he said that we were all under arrest.[3]

The Mayor ordered the officers posted at the rolling gate to shut it. He told the employees that they were not to touch any of their tools, which were being impounded by the city. He then left the parking facility and went up a flight of stairs to the first floor of the tower. Méndez-Ayala, Santiago and several workers remained behind, where they were detained by armed police officers. Comagro

---

[3] Although Méndez-Ayala's testimony appears to indicate that Mayor O'Neill changed his mind twice, it is unclear whether the Mayor twice asked Méndez-Ayala to leave and twice changed his mind. Counsel for Guaynabo briefly inquired into this issue on cross-examination, but the responses to that line of questioning were also unclear.

workers who had been assigned elsewhere in the project soon joined them, escorted there by police.

Méndez-Ayala was then able to convince a police officer in the parking facility to escort him to the Mayor's location in the tower. Once there, Méndez-Ayala again tried to reason with the Mayor, telling him "that he was doing things the wrong way . . . . And he looked at me disdainfully, as if he could care less." Possibly during this same discussion, or during a later detention discussion (the sequence is unclear), Méndez-Ayala again asked the Mayor his reason for detaining Comagro's employees. This time, the Mayor revealed his frustration with the company:

> And I told [the Mayor], well, listen now, what's going on? What's the problem? What have we done? And he told me that he was really upset, that he had done everything to work with us . . . and we were bringing up an arbitration case. And he got really upset, and he -- he said, just go. Just go. Just go. Go to hell. And just leave.

It was then 11:30 a.m., and the Comagro employees had been detained for about two hours. Shortly thereafter, Méndez-Ayala, Santiago, and the Comagro workers were allowed to leave the site. After being told that their tools would remain impounded, Méndez-Ayala again objected, protesting to the Mayor that the impounding was an "abuse of power" and that the subcontractors would be unable to work elsewhere without their tools. The police allowed workers to take personal tools, but several other tools, as

-12-

well as a company car, remained in city possession until days later.

Just as the detention was ending, Méndez-Matos arrived at the project site. Méndez-Ayala had called his father thirty minutes earlier, telling him that the Mayor had arrived with police officers, bodyguards, and patrol cars, and that he himself had been arrested and Comagro's equipment impounded. The situation, he said, was "a mess," and he "didn't know what it was all about." The "animosity and hostility of the[] police agents, and the mayor himself" worried Méndez-Ayala, and he asked his father to stay away from the project because "things look[] ugly here." The phone call "enormously concerned" Méndez-Matos, who feared for his son's life. He drove to the government center, bringing a camera.

Méndez-Matos parked some distance from the government center and approached on foot. At the project site, he saw police officers and a "whole bunch of patrol cars." Walking around the project, Méndez-Matos began taking pictures, including several of the patrol cars stationed outside the parking facility. A police officer told him to stop, but Méndez-Matos "just went ahead and walked on." As he continued around the outside of the project, Méndez-Matos met Méndez-Ayala and Santiago. Méndez-Ayala described his father as "really concerned and somewhat agitated," and asked him to leave. The Mayor's "people," he believed, were "looking for trouble. I was concerned they would beat [Méndez-Matos] and that

I might be beaten up as well." Méndez-Matos refused to leave, telling his son, "I'm not going to leave you here so that you can get killed."

When the Mayor appeared with several officers, Méndez-Matos approached him. As he did this, Méndez-Ayala said, the police officers "gripped their holsters sort of as in a threat." Afraid of the possibility that the Mayor's guards would injure his father, Méndez-Ayala testified that he felt "impotent, flustered, fearful." According to Méndez-Matos, the police officers "crowded all around me, and I looked around, I saw one of them gripping his firearm, and I felt fear." He described the confrontation as follows:

> [T]he mayor was coming towards me. And he was there -- he was being followed by his body guard and by another guard. And he came -- he was coming over with a very bad demeanor, and proffering dirty words. And I was very upset, and I faced him, squared off with him. And I was very upset about everything, because of the way they had treated my people and the way they had treated my son, and in the face of this abuse of power, and the manner in which he had treated my son. And that's when my son came over to me and said -- because you see the guards had surrounded me . . . and my son said, look, dad, just leave . . . because what they want to do is give you any number of blows. They want to club you. . . . I withdrew.

Méndez-Matos left the project site but remained in Guaynabo. Even after he left, he said, he feared for his son's life. The Mayor was doing something "entirely illogical," and "when someone does

-14-

something as illogical as that raid, then one can expect anything."
At trial, in March 2007, Méndez-Ayala testified that he feared
reprisal and was "still scared. . . . Anything can happen . . .
with these people who have so much influence and more so now."[4]

**II**.

On June 6, 2005, Méndez-Matos, his wife Margarita Ayala-
Rivera, their conjugal partnership, his son Méndez-Ayala, and
Comagro brought suit against Mayor O'Neill, his wife Alba Alvelo de
O'Neill, their conjugal partnership, the Muncipality of Guaynabo,
and several unnamed police officers, their wives, and conjugal
partnerships.[5]  In their complaint, plaintiffs asserted a violation
of their federal constitutional rights pursuant to 42 U.S.C. § 1983
and a violation of their civil rights guaranteed by Article 1802 of
the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141.  They
sought compensatory damages under both statutes for pain and
suffering, and punitive damages under section 1983 for the

---

[4] The conflict between Comagro and Mayor O'Neill continued in
the days that immediately followed November 26.  Pursuant to a deal
brokered by attorneys for the city and Comagro, Méndez-Matos
returned to the project on Monday, November 29, to obtain video
footage of the building's conditions.  The Mayor, accompanied by
police officers, intercepted Méndez-Matos and removed him from the
building.  After further negotiation, Méndez-Matos returned to the
project on Tuesday, November 30, again to shoot a video; again
Mayor O'Neill attempted to prevent the taping.  Only after
intervention by the Vice Mayor and attorneys for both parties was
the videotaping allowed to proceed.

[5] In what follows, we will any omit reference to claims
brought by or against spouses and conjugal partnerships.

-15-

defendants' reckless disregard of their federally protected rights. Upon defendants' motion to dismiss, the district court dismissed with prejudice the section 1983 claims advanced by Méndez-Matos, as well as Méndez-Ayala's section 1983 claims against the municipal police officers.

The court held a jury trial on the section 1983 claims brought by Méndez-Ayala and Comagro, as well as the Article 1802 claims brought by Méndez-Ayala, Méndez-Matos, and Comagro. At the close of evidence, the parties agreed to dismiss Comagro's claims. On March 28, 2007, the jury found the defendants liable on Méndez-Ayala's section 1983 and Article 1802 claims, awarding him $35,000 in compensatory damages against the defendants jointly and severally, and $350,000 in punitive damages against Mayor O'Neill personally on the section 1983 claim. It found the defendants liable on Méndez-Matos's Article 1802 claim, and awarded him $50,000 in compensatory damages against the defendants jointly and severally.

Defendants filed post-trial motions seeking judgment as a matter of law and, in the alternative, remittitur of the damage awards or a new trial. See Fed. R. Civ. P. 50(b), 59(a). Concluding that the evidence presented was sufficient to sustain the liability findings and compensatory damages, but that the punitive damage award violated due process limits, the court

reduced the punitive damage award to $35,000 and denied the balance of the defendants' motions.

In his appeal, Méndez-Ayala contends that the district court erred in finding that the punitive damage award of $350,000 violated the Due Process Clause. In their cross-appeal, Mayor O'Neill and Guaynabo argue that plaintiffs failed to surmount the threshold requirement for punitive damages under section 1983, that the compensatory damage award was grossly excessive, and that Méndez-Matos did not sufficiently prove the mental distress required to recover under Article 1802. We consider first the size of Méndez-Ayala's compensatory damage award, then the punitive damages issues raised by the section 1983 claim, and finally the judgment and award for Méndez-Matos under Article 1802.

## III.

In their cross-appeal, Mayor O'Neill and Guaynabo assert two challenges to the section 1983 judgment entered against them.[6] First, they argue that the evidence was insufficient to support a verdict in favor of Méndez-Ayala. Second, they argue that the district court erred in denying their motion for a new trial or remittitur on the ground that the $35,000 compensatory damage award was excessive. However, only the second of these arguments is

---

[6] The compensatory damages challenged here were awarded by the jury under both section 1983 and Article 1802. However, in their brief and at oral argument, counsel for cross-appellants treat the award as if it were under section 1983 alone.

developed in their briefs.  Moreover, in response to questioning at oral argument, counsel for cross-appellants conceded the issue of liability.  For these reasons, we will consider the challenge to the size of the compensatory damages award only.

Where, as here, defendants have timely moved for a new trial or remittitur under Federal Rule of Civil Procedure 59, "our inquiry is limited to determining whether the trial court abused its discretion in refusing to set aside the verdict as excessive." Borges Colon v. Roman-Abreu, 438 F.3d 1, 20 (1st Cir. 2006) (internal quotation marks and citation omitted).  A jury's award of compensatory damages will be overturned only if it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  Correa, 69 F.3d at 1197 (internal quotation marks and citation omitted).

We agree with the district court that cross-appellants failed to make the required showing.  Several considerations support the size of the jury's award.  The Mayor assembled a large, armed force of police officers and bodyguards.  While in command of this force the Mayor acted in irrational and unpredictable ways, causing anxiety to Méndez-Ayala.  For example, he used his officers to surround and threaten Méndez-Matos, a confrontation witnessed by his son, Méndez-Ayala, and described as being nearly violent and causing him to feel "impotent, flustered, fearful."  The Mayor's

special influence and authority further magnified these feelings. Méndez-Ayala testified at trial that he remained anxious about the possibility of reprisals against his family and friends.[7]  In light of this testimony, cross-appellants' assertion that Méndez-Ayala could not have suffered any distress because he had the equanimity to negotiate with the Mayor during the confrontation is simply unpersuasive.  Méndez-Ayala told the jury that the arrest felt like it lasted "a week."

Cross-appellants also argue that the award was grossly excessive because Méndez-Ayala failed to adduce expert testimony about his emotional distress.  A plaintiff does not need to present expert testimony to recover damages for emotional distress caused by the violation of his civil rights.  Bolden v. Se. Penn. Transp. Auth., 21 F.3d 29, 34 (3d Cir. 1994) (noting the agreement of "[a]ll of the courts of appeals that have expressly considered this issue").  Nevertheless, cross-appellants argue that the failure to present expert testimony is relevant to the amount of damages a plaintiff may recover for emotional distress.  For support, they cite our decision in Koster v. Trans World Airlines, Inc., 181 F.3d 24, 35 (1st Cir. 1999) (holding that the absence of "medical or psychiatric evidence" is relevant to determining whether the amount

---

[7] Cross-appellants' assertion that Méndez-Ayala's fear of reprisals was speculative misstates the significance of the testimony.  The compensatory damages award does not reflect the likelihood that a reprisal may in fact occur, but the distress Méndez-Ayala experienced worrying about the possibility.

-19-

of an award for emotional distress is excessive). We do not dispute that the absence of expert testimony is relevant to a claim that an award of damages for emotional distress is grossly excessive. However, the $35,000 award here was not grossly excessive in light of the other evidence presented. As we have discussed, the jury heard testimony that Méndez-Ayala experienced considerable distress. Cf. id. at 36 (entering an award of $250,000 for plaintiff who testified he felt anxious, had trouble sleeping, had a bad vacation, and was less able to participate in the lives of his children). We cannot conclude that the district court abused its discretion in refusing to remit the compensatory award.[8]

## IV.

Punitive damage awards are available in a section 1983 action under limited circumstances. Carey v. Piphus, 435 U.S. 247, 257 n.11 (1978). First, as a threshold matter, the plaintiff must prove that the defendant intentionally violated his federally protected rights, or acted with reckless indifference toward those rights. Smith v. Wade, 461 U.S. 30, 56 (1983); Powell v. Alexander, 391 F.3d 1, 15 (1st Cir. 2004). Second, even if this threshold is met, the Due Process Clause of the Fourteenth

---

[8] Cross-appellants' argument that the compensatory award was grossly excessive because Méndez-Ayala failed to mitigate his damages by seeking medical attention is waived because the argument was insufficiently developed. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Amendment limits the amount of punitive damages available, prohibiting "grossly excessive" awards. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416-17 (2003); BMW, 517 U.S. at 568. We have regularly applied this due process limit to punitive damage awards under federal law, particularly in section 1983 actions. See, e.g., Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 27 (1st Cir. 2006) (section 1983); Davis v. Rennie, 264 F.3d 86, 116 (1st Cir. 2001) (same); Romano v. U-Haul Intern., 233 F.3d 655, 672 (1st Cir. 2000) (Title VII).

During the course of the trial, the district court ruled that the federal right at issue in the section 1983 action was Méndez-Ayala's Fourth Amendment right to be free of an arrest that was not based on probable cause. Thus, the jury had to decide whether the Mayor's detention of Méndez-Ayala at the government center constituted an arrest, and if so, whether the Mayor lacked probable cause to make the arrest. The jury determined that the Mayor did arrest Méndez-Ayala, and awarded punitive damages.[9] These determinations implicate both of the limitations discussed above. First, Mayor O'Neill argues in his cross-appeal that the evidence at trial did not suffice to meet the threshold requirement

---

[9] The Mayor does not challenge on appeal the jury's determination that Méndez-Ayala was arrested on orders of the Mayor, and that there was no probable cause to order the arrest. Instead, as we explain, he argues that the evidence does not support the jury's finding that he acted with reckless indifference to Méndez-Ayala's constitutional rights.

-21-

of an intentional or reckless violation of federally protected rights. Second, Méndez-Ayala argues in his appeal that the punitive damage award was appropriate, and that the district court erred in holding that the jury's original award of $350,000 violated due process limits.[10] We consider first the argument about threshold requirements raised in the cross-appeal.

## A. Threshold Requirement for Punitive Damages

Because it is a question of law, we review de novo whether the evidence presented at trial sufficed to meet the threshold requirement for punitive damages under section 1983. Powell, 391 F.3d at 15 (citing Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 254 (1st Cir. 2000)); Iacobucci v. Boulter, 193 F.3d 14, 25 (1st Cir. 1999).

In Smith v. Wade, the Supreme Court held that punitive damages were proper in a section 1983 suit only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 461 U.S. at 56. The Court later gave this language a crucial gloss in Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999), where it interpreted a provision of Title VII whose language was modeled on Smith. That provision

_____

[10] Mayor O'Neill does not argue that the reduced $35,000 punitive damage award itself violated due process limits. Instead, he asks us to affirm the judgment of the district court if we find that the threshold requirement for punitive damages is met.

permitted punitive damages only in cases where the defendant acted "with malice or reckless indifference to . . . federally protected rights." Id. at 534. Noting that Congress had plainly intended this language to limit punitive damages to a subset of acts of intentional discrimination, the Court concluded that to obtain such damages a plaintiff would have to prove something more than intentional conduct alone. The plaintiff would be required to prove that the defendant "discriminate[d] in the face of a perceived risk that its actions [would] violate federal law." Id. at 536.

We have long applied the Kolstad interpretation of "reckless indifference" under Title VII to section 1983. See Iacobucci, 193 F.3d at 26 n.7 (noting the close connection between Title VII and Smith). Under that approach,

> [t]he special showing needed to trigger eligibility for punitive damages, which the Smith Court called "evil motive" or "reckless or callous indifference," pertains to the defendant's "knowledge that [he] may be acting in violation of federal law . . . . Thus, the standard requires proof that the defendant "acted in the face of a perceived risk that [his] actions [would] violate federal law."

Id. at 26 (citations omitted); see also Casillas-Diaz v. Palau, 463 F.3d 77, 84 (1st Cir. 2006); DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 37-38 (1st Cir. 2001). In describing this approach, we noted the difference between the state of mind necessary for liability and the state of mind necessary for punitive damages:

-23-

> The state of mind required to make out a cognizable section 1983 claim (at least one grounded in false arrest) differs importantly from that required to justify punitive damages. The former requirement relates only to conduct, not to the consequence; that is, it entails an intent to do the act, not to effect a civil rights violation.

Iacobucci, 193 F.3d at 26.

In Iacobucci, we noted that proof of a defendant's awareness of the risk of violating federal law may be circumstantial. See Iacobucci, 193 F.3d at 27. Several different kinds of circumstances may support a conclusion that the defendant was aware of this risk. For example, we have observed that if a defendant's conduct is "egregious or outrageous," it may suggest an awareness of its illegality. See, e.g., Powell, 391 F.3d at 19 (citing Kolstad, 527 U.S. at 536). The existence of an extensive body of federal law on a particular issue also may suggest that the defendant must have been aware of the risk of violating that law. DiMarco-Zappa, 238 F.3d at 38. And we upheld an award of punitive damages against a city attorney, reasoning that in light of her occupation she must have been aware that her conduct risked violating the plaintiff's First Amendment rights. Powell, 391 F.3d at 20.

Mayor O'Neill makes two principal arguments in support of his contention that Méndez-Ayala failed to prove that he acted in the face of a perceived risk that his actions would violate federal law. First, he argues that the evidence only supports the view

-24-

that he was unfamiliar with the contract documents and believed that Comagro should not have been present at the government center on November 26; therefore, he perceived no risk that by arresting Méndez-Ayala he might violate federal law. Second, he argues that the evidence only supports the view that his decision to arrest Méndez-Ayala was so sudden he could not possibly have perceived beforehand that it might violate federal law. We consider these arguments in turn.

1. The Mayor's lack of knowledge about the contractual relationship between Guaynabo and Comagro

The Mayor says that he was unfamiliar with the precise terms of the agreement between Guaynabo and Comagro. He asserts that he never saw the construction contract, the AIA agreement, the certificate of substantial completion, the attached punch list, the November 15 Dávila memo, or the November 18 default letter. He knew only that Comagro and the city were embroiled in a long dispute, that the city had ended the construction contract with the default letter, and that Comagro employees "were not to do any kind of work" on the government center. He insists, therefore, that he was only being "observant" when he investigated the open parking facility at the government center and detained the Comagro employees while police searched the building. He was unaware that the employees might be rightfully present there.

The Mayor's argument does not account for the standard of review, which requires us to view the evidence in the light most

hospitable to the jury's verdict.  See Correa, 69 F.3d at 1188.

Evaluated by that standard, the evidence would permit a reasonable jury to conclude that the Mayor acted in the face of a perceived risk that by arresting Méndez-Ayala he might violate Méndez-Ayala's constitutional right to be free of an arrest not based on probable cause.  The Mayor was aware of the constitutional constraints on his power of arrest.  He offered testimony regarding his role as head of the municipal police force.  When he insisted that he had not required a warrant to arrest Méndez-Ayala, he indicated an awareness of arrest standards.  Even if he lacked a precise understanding of the concept of probable cause, the jury could conclude that the Mayor understood that he could not order an arrest if Méndez-Ayala was lawfully present on the premises.

The jury could also reasonably conclude that the Mayor, despite some testimony of his to the contrary, understood that Méndez-Ayala and Comagro's employees might be rightfully present at the building.  Most significantly, the Mayor told the jury that he knew Guaynabo did not yet have possession of the government center on November 26.  He also testified that his advisors had discussed the default letter with him and that he knew what the letter stated by November 26, the day of the detainment.[11]  The default letter,

_____

[11] The Mayor offered conflicting testimony on this point at trial:

        COUNSEL FOR PLAINTIFFS: So you really don't know the terms of it, of the [default] letter?

which was admitted into evidence, demanded immediate possession of the building, yet sections of the letter reasonably could have been construed to require Comagro employees to be present at the project, fixing identified construction deficiencies.[12] On this record the jury reasonably could have inferred that the Mayor understood that Comagro's employees might be rightfully present at the government center on November 26, and thus that he had no lawful basis for arresting Méndez-Ayala. Moreover, the jury heard other testimony which reasonably suggested another reason

---

THE MAYOR: That is correct.
COUNSEL FOR PLAINTIFFS: It's been stipulated that the letter was received by Comagro on the 24th of November, 2004. As of the 24th of November, 2004, Mr. O'Neill, did you know what the default letter stated?
THE MAYOR: No, I did not know what the letter stated.
COUNSEL FOR PLAINTIFFS: And on October -- November 26, 2004, did you know what the default letter stated?
THE MAYOR: Yes. It was discussed with the legal division and with the project inspector and supervision.
COUNSEL FOR PLAINTIFFS: Okay. So you --
THE MAYOR: And it was discussed with me.
COUNSEL FOR PLAINTIFFS: So you discussed it on the 25th of November? . . .
COUNSEL FOR DEFENDANTS: Objection. That's not the testimony, your Honor.
COUNSEL FOR PLAINTIFFS: That's my question . . . . Would you please let me ask the question?
THE COURT: He answered that. He answered that. He discussed it with his staff, I guess. . . .
COUNSEL: Did you discuss it on the 25th of November with your staff? . . .
THE MAYOR: I'm sorry. We did not discuss the contents to any letter.

[12] In fact, this is what the Comagro employees were doing at the government center on November 26th: fixing identified deficiencies to prepare the project for delivery.

-27-

altogether for the arrest. When asked by Méndez-Ayala why he had been arrested, the Mayor said he was upset "because he had done everything to work with us . . . and we were bringing up an arbitration case." A jury could reasonably conclude that the Mayor's pique at Comagro's temerity in seeking to arbitrate its contract dispute was the motivating cause that led him to arrest Méndez-Ayala and hold him in custody at the site for two hours, despite his awareness that Méndez-Ayala might be lawfully present at the site. This attitude of the Mayor demonstrated a conscious indifference to the possibility that the arrest would violate Méndez-Ayala's constitutional rights. See Iacobucci, 193 F.3d at 26.

2. The Mayor's sudden decision to arrest

Mayor O'Neill also argues that he could not possibly have perceived a risk of violating federal law because he decided to arrest Méndez-Ayala with little or no calculation. For support, the Mayor points to our decision in Iacobucci, 193 F.3d at 27, where we held that the plaintiff had not met the threshold requirement for a punitive damage award. There we found it dispositive that the defendant, a police officer, had made a "split-second decision" to arrest the plaintiff. Such a decision, we observed, does not "lend itself to the inference that [the officer] acted with an evil motive or a conscious awareness that the arrest might violate [the plaintiff's] civil rights." Id. at

-28-

26. Punitive damages should not lie where the evidence showed only "an exasperated police officer, acting in the heat of the moment, [who] made an objectively unreasonable mistake." Id. at 26-27.

Seeking to analogize this case to Iacobucci, Mayor O'Neill points to Méndez-Ayala's testimony that the Mayor's decision to arrest the Comagro employees occurred "[a]ll of a sudden," or "immediately." The Mayor interprets this testimony to mean that he, like the police officer in Iacobucci, made a "split-second" decision, "in the heat of the moment," and therefore could not have perceived a risk that his conduct would violate Méndez-Ayala's federal rights.

Iacobucci does not stand for the proposition that a change of decision made without prior warning, in a short period of time, is always immune from punitive damages under section 1983. Such a rule would exempt a large class of conduct from punitive damages, including conduct for which we have previously affirmed awards. See, e.g., Davis, 264 F.3d at 115 (affirming an award of punitive damages against a nurse who, during an altercation, punched a patient in the head). Iacobucci involved a rapidly developing situation which demanded an immediate response. See Iacobucci, 193 F.3d at 26. The plaintiff, Iacobucci, had insisted on filming a meeting that city officials insisted should not be filmed. His conduct forced the defendant officer to act quickly, "in the heat of the moment," "to defuse a contentious situation."

-29-

Id. Because he was forced to confront an emergency, the defendant did not have an opportunity to consider the range of risks his conduct created.

Taken in the light most favorable to the jury's verdict, the facts in this case do not fit the Iacobucci pattern. The Mayor was not called to the location by a distressed party seeking assistance or protection. He was uncertain about the right of the Comagro employees to be on the site.[13] Moreover, before the police arrived, the Mayor had an opportunity to contemplate the legal consequences of different courses of action. After asking the Comagro employees to leave the building, no exigency presented itself that required him to decide then to arrest those employees. There was no need to act precipitously. Méndez-Ayala's question to the Mayor -- "And I said, well, hey, wait a minute. What's going on?" -- was not provocative. The Mayor's conduct and his inflammatory, profane language indicate that he simply lost control of his temper and his judgment. His statement to Méndez-Ayala that he was already angry at Comagro because it sought arbitration and Méndez-Ayala's claim that the Mayor was "looking for trouble" could have reasonably suggested to a jury that the Mayor was not acting

---

[13] As our discussion in section IV(A)(1), supra, shows, the facts as viewed in the light most hospitable to the verdict do not support the Mayor's contention that he believed a criminal trespass was occurring. Instead, the evidence supports the view that the Mayor was uncertain about the right of the Comagro employees to be present on the site.

"in the heat of the moment," but was seeking retaliation. Then, instead of immediately releasing Méndez-Ayala and the Comagro employees, the Mayor kept them under arrest for about two hours, when he had an ample opportunity to contemplate the consequences of his conduct. Iacobucci does not insulate such conduct from punishment. We reject the contention in the cross-appeal that the threshold requirement for an award of punitive damages was not met.

## B. Due Process Limits on Punitive Damages

We review de novo the district court's determination of the constitutionality of the jury's punitive damages award. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001); Davis, 264 F.3d at 116. De novo review is appropriate here because a punitive award implicates constitutional questions of due process. See Cooper Indus., 532 U.S. at 435. If we find an award "grossly excessive," we may ascertain the amount of punitive award that is appropriate and order the district court to enter judgment in such amount. Bisbal-Ramos, 467 F.3d at 27.

Where properly imposed, punitive damages further legitimate state interests in the punishment and deterrence of unlawful conduct. Philip Morris USA v. Williams, 549 U.S. 346, 352 (2007). An award "grossly excessive" with respect to those interests violates the Due Process Clause, which requires that an individual have fair notice of the penalty to which his conduct could expose him. BMW, 517 U.S. at 574. In BMW, the Supreme Court

-31-

provided three guideposts for determining whether a punitive damages award was "grossly excessive" in this sense: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  Id. at 575; see also State Farm, 538 U.S. at 418.

In his appeal, Méndez-Ayala urges us to vacate the order of the district court reducing the punitive damages award from $350,000 to $35,000.  He argues that the jury's award did not grossly exceed an amount necessary to punish Mayor O'Neill and deter him from similar conduct in the future.

1. Degree of Reprehensibility

As the Supreme Court has repeatedly stated, and as we have long recognized, the degree of reprehensibility is the most important guidepost in the BMW test.  State Farm, 538 U.S. at 419; Casillas-Diaz, 463 F.3d at 85; Davis, 264 F.3d at 116.  In measuring the reprehensibility of a defendant's conduct, the Supreme Court has instructed us to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result

of intentional malice, trickery, or deceit, or
mere accident.

State Farm, 538 U.S. at 419 (citing BMW, 517 U.S. at 576-77).

We begin with harm, which is especially significant in the determination of reprehensibility. Conduct involving "violence or the threat of violence" is generally regarded as being more serious than nonviolent conduct. BMW, 517 U.S. at 575-76 (citing Solem v. Helm, 463 U.S. 277, 292-93 (1983)). Actual physical injury is not essential. See id. Conduct imposing a significant threat of violence may be considered reprehensible, even if it does not result in actual injury. Romanski v. Detroit Entm't, LLC, 428 F.3d 629, 643-44, 649 (6th Cir. 2006) (awarding punitive damages of $600,000 in a section 1983 suit for false arrest where there was no violence, but "the threat of physical force was apparent"); Lee v. Edwards, 101 F.3d 805, 813 (2nd Cir. 1996) (awarding punitive damages of $75,000 for malicious prosecution). A threat of violence may be especially serious if a state official creates it by using his authority. See Lee, 101 F.3d at 810.

Although Méndez-Ayala suffered no physical injuries, the Mayor's conduct created a real and serious threat of violence. He used armed police officers to detain the employees, impound their property, and destroy city property by running their vehicles through wet cement. Accompanied by body guards, the Mayor continuously inflamed the situation by verbally accosting Comagro employees, including Méndez-Ayala. On multiple occasions, he told

them that their work was "shit," "no good," "junk," and that they should "go to hell" and "jerk off." Méndez-Ayala testified that the Mayor was "looking for trouble." After enduring these insults Méndez-Matos "squared off" with the Mayor and was surrounded by armed officers. During this confrontation, Méndez-Ayala said, he was worried the guards would beat up both him and his father. By conducting himself in this way, the Mayor needlessly transformed a business dispute into a dangerous confrontation.

The same facts also speak to the second factor identified by the Supreme Court: whether the defendant's conduct showed "reckless disregard of the . . . safety of others." See State Farm, 538 U.S. at 419. The Mayor's decision to angrily confront and detain the Comagro employees showed little concern for the danger this conduct might create. His explanation that he simply "lost his cool" does not mitigate his culpability for the dangerous situation he created.

At the same time, consideration of the other factors identified by the Supreme Court lessens the reprehensibility of the Mayor's conduct. It was undisputed that before the Mayor arrested the Comagro employees, he told them to leave. If Méndez-Ayala had left the facility immediately instead of questioning the Mayor's actions, the detention might have been avoided. Fortunately, no one was injured as a result of the Mayor's actions. One of the officers assisted Méndez-Ayala during the detainment by escorting

-34-

him to the Mayor. The Mayor himself ultimately responded to Méndez-Ayala's requests by releasing the workers and returning their personal equipment after two hours.

Other reprehensibility factors identified by the Supreme Court play no role here. For example, no evidence suggested that the target of the Mayor's conduct, Méndez-Ayala, was "financially vulnerab[le]." The arrest was a one-time occurrence. Nor does the evidence suggest that the Mayor acted with "intentional malice, trickery, or deceit."

In sum, there is a disconnect between the degree of reprehensibility of the Mayor's conduct and the jury's large punitive damages award. While the Mayor created a serious risk of violence, the absence of any actual injury, his initial request that the employees leave, and the relatively short duration of the arrest and speedy return of equipment lessen the reprehensibility of his conduct. The absence of other factors identified by the Supreme Court, such as vulnerability, also lessens the degree of reprehensibility.

2. Disparity between harm or potential harm and punitive damages

Under the second BMW guidepost, we consider whether punitive damages bear a reasonable relationship to the harm that the defendant's conduct caused or is likely to have caused. BMW,

517 U.S. at 581. While the ratio of punitive damages to compensatory damages is relevant to this inquiry, the Supreme Court has long declined to "impose a bright-line ratio which a punitive damages award cannot exceed." State Farm, 538 U.S. at 424. Nevertheless, the Court has noted that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[14] Id. at 425. However, the focus of our inquiry is not the ratio itself, but whether "the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id. at 426.

A punitive award many times the size of the compensatory award may be "reasonable and proportionate" in certain circumstances. For example, "particularly egregious conduct that results in relatively low actual damages can support a higher ratio than conduct that is less reprehensible." Romano, 233 F.3d at 655 (internal quotation marks and citation omitted); see BMW, 517 U.S. at 582. We do not have that situation here. Although the Mayor's conduct was reprehensible, it was not "particularly egregious" in comparison to defendants' conduct in other cases supporting substantial punitive awards. See, e.g., Davis, 264 F.3d at 91, 117

---

[14] In Exxon Shipping Co. v. Baker, 128 S. Ct. 2605 (2008), the Court established a 1:1 ratio of punitive to compensatory damages under federal maritime law. By its own terms, however, the rule does not apply here. See id. at 2626. ("Today's enquiry differs from due process review . . . .").

(repeated punching of mental patient); <u>Casillas-Diaz</u>, 463 F.3d at 82 (suspect beaten unconscious by police); <u>Romano</u>, 233 F.3d at 673 (intentional violation of anti-discrimination law). The Mayor was not violent and he caused no physical injury. Before detaining the employees he asked them to leave the premises. The detention itself lasted two hours. The evidence would not support a conclusion that the Mayor intentionally violated a constitutional right, as did the defendant in <u>Romano</u>. See <u>Romano</u>, 233 F.3d at 669.

Conversely, where the compensatory award is substantial, a ratio of punitive-to-compensatory damages larger than one-to-one may be unreasonable. <u>State Farm</u>, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.") In this case, although Méndez-Ayala's compensatory damages award was not excessive, it did amply compensate him for the mental distress resulting from his confrontation with the Mayor. Although not the sole determinant in the analysis, this fact supports the one-to-one ratio between the compensatory damages awarded to Méndez-Ayala and a $35,000 punitive damages award.[15]

---

[15] Consideration of the harm the Mayor might have caused does not change our conclusion. While the jury may consider potential harm in its award of punitive damages, <u>TXO Prod. Corp.</u> v. <u>Alliance Res. Corp.</u>, 509 U.S. 443, 459-60 (1993), the evidence suggests that it was Méndez-Matos, not Méndez-Ayala, who faced the most

3. Civil penalties in comparable cases

Under the final BMW guidepost, we consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.[16] State Farm, 538 U.S. at 428. In discussing this guidepost, the Supreme Court has asked reviewing courts to accord deference to legislative judgment about the appropriate sanction for the conduct at issue. BMW, 517 U.S. at 583. In the case of section 1983, however, Congress did not address damage awards; therefore, we compare the present award with awards we have permitted in similar section 1983 suits. Davis, 264 F.3d at 117 (citing Zimmerman, 262 F.3d at 82). While we look first to authorities within our own circuit, we are not confined to such sources. See BMW, 517 U.S. at 584

_____

significant risk of serious physical injury when he was surrounded by the Mayor's armed guards. Even if we assume that Méndez-Ayala might have suffered some physical injury, or greater mental distress, this potential does not alter our view that there was too great a disparity here between the harm or potential harm and the punitive damages.

[16] The Supreme Court previously directed us to compare the punitive award to criminal penalties as well as civil penalties. See BMW, 517 U.S. at 583. More recently, however, the Court has stated that criminal penalties have "less utility" in comparing the size of awards under the third BMW guidepost. State Farm, 538 U.S. at 428. The present case demonstrates at least part of the difficulty. The penalty for "aggravated restraint of liberty" under the Puerto Rico Penal Code is imprisonment of no more than five years and a fine no more than $3,000. P.R. Laws Ann. tit. 33, § 4172. While the applicable fine is far smaller than the punitive damages awarded in this case, five years of imprisonment is a very serious penalty. See BMW, 517 U.S. at 583 (noting the significance of imprisonment in this context).

-38-

(considering statutes from various jurisdictions); <u>Romanski</u>, 428 F.3d at 646, 648 (looking outside circuit case law).

Although Méndez-Ayala argues that this Court has upheld far larger punitive awards, the facts in those cases differ in critical respects from the facts here. For example, we have affirmed large punitive awards where the plaintiff suffered significant physical injury. In <u>Davis</u>, where we affirmed a punitive damages award of over $1 million, the plaintiff was thrown to the ground and repeatedly punched in the head. <u>Davis</u>, 264 F.3d at 94; <u>see</u> <u>also</u> <u>Casillas-Diaz</u>, 463 F.3d at 86. Where we have approved large awards in the absence of violence, the conduct at issue was typically intentional or malicious, such as discrimination. <u>See</u>, <u>e.g.</u>, <u>Rivera-Torres</u> v. <u>Ortiz Velez</u>, 341 F.3d 86, 102 (1st Cir. 2003) (affirming a punitive award of $250,000 for politically motivated discrimination); <u>Zimmerman</u>, 262 F.3d at 83-84 (affirming an award of $400,000 for violations of state discrimination law); <u>Romano</u>, 233 F.3d at 673 (affirming an award of $285,000 for violations of Title VII and state law).

In contrast, our case law provides no guidance for determining what penalty is appropriate for engaging in a non-violent violation of the Fourth Amendment. Outside our circuit, similar cases have resulted in punitive awards under $100,000. <u>See</u>, <u>e.g.</u>, <u>Dean</u> v. <u>Olibas</u>, 129 F.3d 1001, 1007 (8th Cir. 1997) (affirming an award of $70,000 for malicious prosecution); <u>Lee</u>, 101

-39-

F.3d at 813 (reducing a punitive award from $200,000 to $75,000 for malicious prosecution). The only case upholding a substantially larger punitive award for a non-violent violation of Fourth Amendment rights, <u>Romanski</u>, 428 F.3d at 632, involved malicious conduct not present here.

4. Conclusion

After applying the <u>BMW</u> guideposts, we agree with the district court that the jury's punitive damages award of $350,000 grossly exceeded what was necessary to punish and deter the Mayor's conduct. <u>See</u> BMW, 517 U.S. at 587. Because the Mayor lacked fair notice that his conduct could expose him to a penalty of this magnitude, we find that the jury's punitive award violates due process limits.

When faced with a case where a punitive damages award is unconstitutionally excessive, but some punitive damages are warranted, we may ascertain the appropriate amount and order the district court to enter judgment in such amount. <u>Bisbal-Ramos</u>, 467 F.3d at 27. We agree with the district court that a punitive award of no more than $35,000 is permissible in this case, and we therefore affirm that award. This award adequately reflects the degree of reprehensibility of the Mayor's conduct. Given the nature of the harm and the adequacy of the jury's compensatory damages award, there is no justification for a great disparity between the compensatory and punitive awards. The award of $35,000

is also consistent with the awards upheld in similar cases. In sum, the same reasons that persuaded us that the jury's award of $350,000 violated due process persuade us that an award of $35,000 comports with due process.

**V.**

Finally, Mayor O'Neill and Guaynabo cross-appeal the jury's award of $50,000 for Méndez-Matos under his pendant state law claim pursuant to Article 1802 of the Puerto Rico Civil Code. Again it is unclear whether they argue that the evidence is insufficient to support a judgment under Article 1802, or that the compensatory award is grossly excessive. Since it makes no difference in the outcome, we address both arguments.

## A. Liability under Article 1802

We review de novo the district court's denial of a motion for judgment as a matter of law. Bisbal-Ramos, 467 F.3d at 22. The evidence is insufficient to support the jury's verdict if, viewing the evidence in the light most favorable to the verdict, a rational jury could not have found in favor of the prevailing party. Id.

Article 1802 of the Puerto Rico Civil Code states that "[a] person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. As the Puerto Rico Supreme Court has "repeatedly recognized," individuals who suffer distress

-41-

because a relative or loved one is tortiously injured have a cause of action under Article 1802 against the tortfeasor. Santini Rivera v. Serv Air, Inc., 1994 P.R.-Eng 909,527 (P.R. 1994), No. RE-93-232, 1994 WL 909527 (P.R. Sept. 12, 1984). To prevail on such a theory, a plaintiff must prove (1) that he has suffered emotional harm, (2) that this harm was caused by the tortious conduct of the defendant toward the plaintiff's relative or loved one, and (3) that the defendant's conduct was tortious or wrongful. See id. The cause of action is derivative and depends on the viability of the underlying claim of the relative or loved one. Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 12-13 (1st Cir. 2007).

In their cross-appeal, Mayor O'Neill and Guaynabo acknowledge that Puerto Rico law recognizes a cause of action for individuals in Méndez-Matos's situation, but argue that it requires proof of greater emotional distress than he established. Pointing in particular to Serrano v. Nicholson Nursery, Inc., 844 F. Supp. 73 (D.P.R. 1994), Reyes v. Eastern Airlines, Inc., 528 F. Supp. 765 (D.P.R. 1981), and Hernández v. Fournier, 80 P.R. Dec. 94 (P.R. 1957), they assert that under Puerto Rico law, an individual must prove "deep moral suffering and anguish," not merely a "passing suffering," to recover for tortious injury to relatives or loved

-42-

ones.[17]  In contrast, they argue, testimony at trial established only that Méndez-Matos was momentarily angry or frightened.

We do not decide if Puerto Rico law makes the distinction advanced by the cross-appellants.  Instead, we assume that Puerto Rico requires more than proof of "passing suffering" to recover for tortious injury to relatives, and conclude that even on the standard the cross-appellants suggest, a rational jury could have found for Méndez-Matos on the evidence introduced at trial.

Viewed in the light most favorable to the verdict, the testimony offered at trial established the depth and duration of Méndez-Matos's emotional distress.  Méndez-Matos told the jury that he feared for his son's life after receiving a phone call from him, explaining that he had been detained by the Mayor and "his escorts."  During that call, Méndez-Ayala told his father that "things looked ugly," and asked him not to come.  Méndez-Matos came anyway, and when he arrived appeared "really concerned."  He was so upset about the treatment of his son, he confronted the Mayor and his armed guards, who surrounded him and gripped their weapons.  Méndez-Ayala managed to call his father off, but Méndez-Matos was concerned that the Mayor's conduct was so "illogical," anything might happen to his son.  He initially refused his son's entreaty

---

[17] Although Méndez-Matos was directly involved in the events at the government center, his claim under Article 1802 depends on the emotional distress he suffered because of the arrest of his son.

to leave, saying "I'm not going to leave you here so you can get killed." Even after he left the government center, Méndez-Matos said, he feared for his son's life. In light of this testimony, it was not unreasonable for the jury to conclude that Méndez-Matos met the standard of proof argued by the cross-appellants.

## B. Excessive compensatory award

Because cross-appellants timely moved below for a new trial or remittitur, we review for abuse of discretion the district court's decision not to set aside the award as excessive. Borges Colon, 438 F.3d at 20. We overturn the jury's award only if it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Correa, 69 F.3d at 1197.

As we have seen, the jury heard ample evidence of the distress Méndez-Matos experienced because of the Mayor's conduct, including his "enormous[] concern[]" after receiving Méndez-Ayala's phone call, his anxiety during the confrontation with the Mayor, and his continuing fear for his son's well-being after leaving the government center. The district court did not abuse its discretion in concluding that the record contained sufficient evidence to sustain the jury's $50,000 award.

Affirmed.