**Marta OJEDA–RODRIGUEZ, Plaintiff,**

**v.**

**Yolanda ZAYAS, et al., Defendants.**

**Civil No. 05–2332 (FAB).**

United States District Court,
D. Puerto Rico.

Oct. 22, 2009.

246

Manuel San–Juan–Demartino, Manuel San Juan Law Office, San Juan, PR, for Plaintiff.

Francisco A. Ojeda–Diez, P.R. Department of Justice—Federal Litigation, Anabelle Quinones–Rodriguez, Maymi, Rivera & Rotger, P.S.C., San Juan, PR, for Defendants.

## OPINION & ORDER

FRANCISCO A. BESOSA, District Judge.

On December 23, 2005, plaintiff Marta I. Ojeda–Rodriguez ("Ojeda") filed a com-

plaint against defendants Yolanda Zayas–Santana ("Zayas"), the former Secretary of the Family, in her personal and official capacity, and the Department of the Family ("DOF").[1] (Docket No. 1) Ojeda alleged two causes of action, the first for violation of her due process right to a pretermination hearing, and the second for defamation under Puerto Rico Commonwealth law. After a seven day trial, on February 6, 2008 the jury returned a verdict in favor of Ojeda finding that Zayas violated her constitutional right to due process and that Zayas made a defamatory statement concerning Ojeda. (Docket No. 92) The jury awarded Ojeda $150,000.00 in compensatory damages for her due process claim, $350,000.00 in compensatory damages for her defamation claim, and $1,000,000.00 in punitive damages. (*Id.*) Following the entry of judgment, defendants filed a bevy of post-judgment motions. (Docket No. 105) Ojeda opposed these motions. (Docket No. 128) She also filed a motion for attorney fees (Docket No. 99), which the defendants asked the Court to stay. (Docket No. 100)

For the reasons discussed below, the Court **DENIES WITH PREJUDICE** defendants motions pursuant to Rules 50, 59(a) and 59(e); **DENIES WITHOUT PREJUDICE** Ojeda's motion for attorney fees; and **REDUCES** Ojeda's punitive damages award from $1,000,000.00 to $500,000.00.

## I. Background

This case poses two legal questions: (1) was Ojeda denied due process of law because of faulty notice and a faulty hearing prior to her termination from employment; and (2) did Zayas slander Ojeda by making public statements that reflected negatively upon Ojeda? To answer both of these legal questions, however, the Court must delve somewhat into a meta-narrative that asks a much broader question: was Ojeda made a scapegoat to assuage public anger over the DOF"s handling of a boy in its custody, "the minor?"[2] Although this last question shall not be conclusively answered here, some part of the narrative will be provided in order to evaluate the legal questions that are posed.

The following is just a snapshot of the factual background because additional background shall be provided in subsequent sections of the opinion:

Ojeda began to work in the Legal Division of the Administration of Children and Families of the DOF ("ADFAN" by its Spanish language acronym) on June 28, 2002. At some point after June, 2002 the DOF initiated judicial proceedings with respect to the custody of the minor. The case was assigned internally to attorney Sonny M. Arroyo–Pedro ("Arroyo"), Ojeda's co-worker in the Carolina Office of ADFAN's legal division. During the month of September, 2003, Arroyo, who at all times until then had handled the minor's case, went on leave from the office for a period of approximately two months because of her parents' poor health. During this time period Ojeda took charge of all of Arroyo's cases, including the minor's case. It was during this time period that Ojeda prepared a petition for the termination of parental rights of the minor's parents. Ojeda and Arroyo both testified that the petition was prepared at the express direction of Maria de los Angeles Colom–Baez ("Colom"), who was then the Director of ADFAN's legal division. This

---

1. By the time trial began in this case Zayas was no longer the Secretary of the Family, and thus she was replaced by her successor as Secretary, Felix Matos, who represented the DOF in his official capacity.

2. In the press and at trial the minor was usually referred to as "the Russian boy." Testimony at trial linked the boy to both Lithuanian and Russian origins. The Court shall simply refer to him as "the minor."

petition was later voluntarily dismissed by Colom herself under circumstances not entirely cleared up at trial. During the pendency of the minor's case there was a great deal of media scrutiny concerning the case in general and the actions of the DOF in particular in handling the minor's case.

Months later, on July 28, 2004, following the completion of three investigations commissioned by Zayas into what had transpired in ADFAN's handling of the minor's case, Ojeda was notified by letter from Zayas that the DOF intended to dismiss her from her position. The letter, dated June 14, 2004, stated that Ojeda had been negligent in filing the petition for the termination of parental rights and that the petition had been filed based upon incomplete information. That same day Zayas issued a press release in which she said "various persons from the Carolina region failed in their duties and obligations in the handling of the Lithuanian boy's case. For this reason I have sent letters to four functionaries announcing the intention to dismiss them." Ojeda requested an administrative hearing regarding her proposed dismissal; it was held before hearing officer Angel Robles–Candelaria ("Robles") on September 3, 2004. On December 23, 2004, Ojeda received notice that DOF was in fact discharging her from her position with ADFAN.

Nearly a year later, on or about December 13, 2005, Zayas testified at a hearing held by the Commonwealth's Office of Court's Administration ("OCA") related to an investigation being carried out by the OCA into the proceedings concerning the minor. Zayas was reported as testifying that the attorneys involved in the minor's case hid the letters that came from the minor's biological family. A newspaper article reporting on Zayas's testimony spe-cifically referred to Ojeda as one of the lawyers involved.

## II. Rule 50 Standard

The Court may grant a motion for judgment as a matter of law once a party has been fully heard on an issue if the court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed.R.Civ.P. 50(a)(1). Where, as here, the Court does not grant a Rule 50(a) motion prior to submitting an action to the jury, the movant may file a renewed motion for judgment within 10 days after the entry of judgment. Fed.R.Civ.P. 50(b). Ojeda has done just that.

The United States Supreme Court has held that when "entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 150–51, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A Rule 50 movant must shoulder a "heavy burden." *White v. New Hampshire Dept. of Corrections*, 221 F.3d 254, 259 (1st Cir.2000) (quoting *United States v. Scharon*, 187 F.3d 17, 20 (1st Cir.1999)). Evidence supporting a verdict may be entirely circumstantial and it need not exclude every hypothesis contrary to the verdict; "that is, the fact-finder may decide among reasonable interpretations of the evidence." *Id.* A court may only grant

judgment as a matter of law when "the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely that the moving party was entitled to judgment." *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 22 (1st Cir.2002) (quoting *Lama v. Borras,* 16 F.3d 473, 477 (1st Cir.1994)).

## A. Statute of Limitations
### 1. Due Process Claim

■ Section 1983 of title 42 of the United States Code, which creates a private right of action for violation of federally protected rights, contains no statute of limitations. Therefore, section 1983 claims "borrow[ ] the appropriate state law governing limitations unless contrary to federal law." *Poy v. Boutselis,* 352 F.3d 479, 483 (1st Cir.2003) (citing *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). The parties do not dispute that the relevant statute of limitations for civil rights claims in Puerto Rico is one year. P.R.Laws Ann. Tit. 31 § 5298(2); *Vistamar, Inc. v. Fagundo–Fagundo,* 430 F.3d 66, 69–70 (1st Cir.2005); *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir.2005). Federal law, however, determines the date on which the statute of limitations begins to run. *Carreras–Rosa v. Alves–Cruz,* 127 F.3d 172, 174 (1st Cir.1997). "The first step" in determining the commencement of accrual "is to identify the actual injury of which the plaintiff complains." *Guzman–Rivera v. Rivera–Cruz,* 29 F.3d 3, 5 (1st Cir.1994); *see also Vistamar, Inc.,* 430 F.3d at 70. The injury of which Ojeda complains is her termination from employment.

■ "As a general principle, section 1983 claims accrue when the plaintiff knows, or has reason to know, of the injury on which the action is based." *Marrero–Gutierrez v. Molina,* 491 F.3d 1, 5 (1st

Cir.2007) (citations and internal quotations omitted). A plaintiff attains this knowledge "at the time of the act itself and not at the point that the harmful consequences are felt." *Id.* at 6 (citing *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (citing *Del. State Coll. v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980))). In an employment discrimination case, "the limitations period begins to run when the claimant receives unambiguous and authoritative notice of the discriminatory act (which is another way of saying that the period begins to run when the employee learns of the adverse employment action)." *Morris v. The Gov't Devel. Bank of Puerto Rico,* 27 F.3d 746 (1st Cir.1994); *see also Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 353 (1st Cir.1992) (holding, in a section 1983 procedural due process case, that "the statute of limitations begins to run when the plaintiff learns of the decision to terminate his employment"); *Ching v. MITRE Corp.,* 921 F.2d 11, 14 (1st Cir.1990). Although Ojeda received notice of her termination on December 23, 2004, exactly one day less than one year prior to the date on which she filed her complaint, December 23, 2005, defendants argue that her claim nonetheless runs afoul of the statute of limitations.

■ In arguing that the statute of limitations has run, defendants detach plaintiffs' termination from the hearing that she was provided and focus upon aspects of the hearing itself. While there is some logic to this approach, it nonetheless is fundamentally flawed. Defendants argue that by July 28, 2004, Ojeda received notice of the internally leveled charges against her (and therefore knew that the notice was flawed). In the alternative, defendants note that at her hearing on September 3, 2004, Ojeda stated that the notice she received was insufficient for due process standards. Defendants argue that as ear-

ly as July 28, but no later than September 4, Ojeda was aware that she had been provided with constitutionally inadequate notice, the basis for her due process claim. Accordingly, defendants reason that the statute of limitations clock should start to run from either of these dates. Although defendants correctly focus upon the inadequate notice as the basis for Ojeda's due process claim, they inappropriately detach the notice and hearing from the eventual outcome of the hearing: the dismissal.

The due process right to a hearing does not exist in a vacuum; it is a right to a pre-termination hearing. Although the hearing provided to Ojeda in this case was faulty, the constitutional harm was not "complete" for the purpose of triggering the statute of limitations clock until Ojeda received notice of her discharge subsequent to the hearing. *See Rivera–Muriente*, 959 F.2d at 354 ("Appellant's injury occurred, in constitutional terms, when he was discharged without first being heard."). To explain further, Ojeda might not have been terminated following the hearing (however unlikely this may seem on the facts developed at trial). If she had not been separated from her employment following the hearing, there would have been no constitutional violation. Therefore, Ojeda's claim did not accrue until she received unambiguous notice of her termination from employment following the faulty hearing. Because Ojeda presented uncontradicted testimony at trial that she received the letter terminating her employment on December 23, 2004, and she filed her complaint within one year of that date, her section 1983 claim for violation of her right to due process is not time barred.

### 2. Defamation Claim

At the Rule 50 stage, defendants attempt to stretch their statute of limitation defense to Ojeda's defamation claim as well as to her due process claim. In so arguing, defendants focus upon Zayas's June 14, 2004 press release and note that the release was issued more than one year prior to the filing of this action. Ojeda, correctly, does not dispute that the one year statute of limitation period for a tort would be applicable to the June 14, 2004 press release; instead she argues that the defendants waived their opportunity to raise the statute of limitation defense in relation to the defamation claim. The Court agrees.

Defendants' answer and their answer to the amended complaint assert in general terms that "the present action is time-barred." (Docket Nos. 12 & 33) There is no additional reference, however, as to what specific claims are time barred, or why they are time barred. In their motion to dismiss filed on April 3, 2006, defendants argued that Ojeda's section 1983 due process claim was time barred. (Docket No. 8) They repeated this argument in their initial scheduling conference memorandum. (Docket No. 25) In neither document did the defendants make any developed argument that Ojeda's defamation claim was time barred. Most importantly, however, defendants again failed to assert that Ojeda's defamation claim was time barred in the proposed pretrial order; instead they again asserted that Ojeda's section 1983 claim was time barred. (Docket No. 55) This failure to develop a statute of limitations defense in the pretrial order is the nail in the coffin of defendant's statute of limitation's argument regarding Ojeda's defamation claim.

Rule 16 states that a pretrial order controls the subsequent course of action unless later modified by another court order to prevent manifest injustice. Fed. R.Civ.P. 16(d) & (e). Here defendants did not seek to amend the final pretrial order, and the case proceeded to trial. It was not until filing a written Rule 50 motion

following trial that defendants argued for the first time that Ojeda's defamation claim was time barred. Defendants raised this argument too late. By failing to argue in the final pretrial order that Ojeda's defamation claim was barred by the statute of limitations, defendants effectively waived this defense. *See Youren v. Tintic School Dist.,* 343 F.3d 1296, 1304–05 (10th Cir.2003) (holding that the defendants waived their statute of limitations affirmative defense by failing to include it in the pretrial order even where they included it—at least in general terms—in their initial pleadings); *Babby v. City of Wilmington Dep't of Police,* 614 F.Supp.2d 508, 510 (D.Del.2009) (holding that the defendant waived its statute of limitations defense because it was not raised in the final pretrial order).

## B. Procedural Due Process

▉ The Due Process Clause of the Fourteenth Amendment guarantees those public employees who possess a property interest in continued employment the right to notice and a hearing prior to the termination of their employment. *Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 542–44, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Gonzalez–De–Blasini v. Family Dept.,* 377 F.3d 81, 86 (1st Cir.2004); *Kauffman v. Puerto Rico Telephone Co.,* 841 F.2d 1169, 1173 (1st Cir.1988). "In order to establish a constitutionally-protected property interest, a plaintiff must demonstrate that [she] has a legally recognized expectation that [she] will retain [her] position." *Gonzalez–De–Blasini,* 377 F.3d at 86 (quoting *Santana v. Calderon,* 342 F.3d 18, 24 (1st Cir.2003)). Property interests are not created by the Constitution; rather "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "A legitimate expectation of continued employment may derive from a statute, a contract provision, or an officially sanctioned rule of the workplace." *Santana,* 342 F.3d at 24 (citing *Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)); *see also Acevedo–Feliciano v. Ruiz–Hernandez,* 447 F.3d 115, 121 (1st Cir.2006).

▉ In Puerto Rico, government employees may be classified as "transitory" or "temporary," on the one hand, or as "career" or "permanent" on the other.[3] *Vazquez–Valentin v. Santiago–Diaz,* 385 F.3d 23, 27 n. 4 (1st Cir.2004), *vacated on other grounds,* 546 U.S. 1163, 126 S.Ct. 1329, 164 L.Ed.2d 43 (2006). "Career" employees have a property right in their continued employment. *See, e.g., Figueroa–Serrano v. Ramos–Alverio,* 221 F.3d 1, 6 (1st Cir.2000). The parties agree that Ojeda was a career employee and that she therefore held a property interest in her continued employment and could not be deprived of that interest without due process of law. The defendants argue, however, that Ojeda was provided with due process of law because the DOF conducted an investigation into the events underlying her dismissal and provided her with notice and a hearing. Ojeda responds that although she was provided with notice and a hearing, both the notice and the hearing were defective and therefore she was not provided with adequate due process of law. After applying the rule 50 standard to the evidence adduced at trial, the Court agrees with Ojeda.

---

**3.** Although not relevant to this case, government employees in Puerto Rico may also be categorized as career (i.e., non-political) versus trust/confidential. *See Ruiz–Casillas v. Camacho–Morales,* 415 F.3d 127, 134 (1st Cir. 2005).

■ Where, as here, a terminated employee is entitled to a pretermination hearing, that hearing "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *see also e.g., Chmielinski v. Commonwealth of Mass. Office of the Comm. Of Probation,* 513 F.3d 309, 316 (1st Cir. 2008); *Cepero–Rivera v. Fagundo,* 414 F.3d 124, 134 (1st Cir.2005); *O'Neill v. Baker,* 210 F.3d 41, 48 (1st Cir.2000). The essential requirements of due process are "notice and a meaningful opportunity to respond prior to termination." *Figueroa–Serrano v. Ramos–Alverio,* 221 F.3d 1, 5–6 (1st Cir.2000). Thus, before a career employee such as Ojeda may be discharged, she is entitled to "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487.

■ In its letter of "intent to dismiss", the DOF accused Ojeda of failing to discuss important aspects of the minor's case with his social worker. The letter went on to say that the failure to discuss "important aspects" of the case resulted in "inexact" or "incomplete" citations that "could have affected the administration of justice" by inducing the Commonwealth Court and the DOF "to error." The letter also charged Ojeda with "negligently" presenting a motion for termination of parental rights in the minor's case "without considering all of the necessary elements." At trial Ojeda explained that she did not understand what "important aspects of the case" she allegedly failed to communicate to the minor's social worker, nor did she understand what "necessary elements" were missing from the motion to terminate

parental rights or even what constitutes "necessary elements." While, based upon further evidence adduced at trial, Ojeda's challenge to notice resonates with the Court at an instinctive level, it is not constitutionally defective. The notice required is determined after taking into account the particular circumstances and conditions under which the letter was sent. *Mard v. Town of Amherst,* 350 F.3d 184, 190 (1st Cir.2003). For the purposes of notice, the DOF need not have told Ojeda ahead of time exactly what it was that she did not communicate to the social worker or exactly which necessary element of a motion to terminate parental rights was allegedly missing from the motion she prepared. *See Cepero–Rivera,* 414 F.3d at 134–35. As a lawyer working within the DOF, Ojeda was capable of determining if she had failed to say anything of importance to the minor's social worker and also of determining if she had in fact left out any "necessary element" from the contested motion. This determination as to what notice the DOF owed to Ojeda is not fatal to her claim, however, because she was also entitled to "an explanation of the evidence against her," and the jury fairly inferred that the defendants failed to provide her with a constitutionally sufficient explanation.

■ The letter of intent to dismiss contained no description of the evidence against Ojeda and the vague, though constitutionally sufficient, notice also failed to suggest the nature of the evidence relied upon by the DOF. Ojeda requested via letter dated August 5, 2004 a description of the evidence. She was not provided with any written or oral description of the evidence. Instead, the record shows that she was brought to a room filled with voluminous documents but with no index. Ojeda testified that looking for the evidence in this room was "worse than looking for a needle in a haystack" because in that situ-

ation "you know you're looking for a needle." (T. February 1, 2008, p. 112, lines 11–18) She did not know what she was looking for, which is exactly what the due process provision requires that she be provided: a description of the evidence against her. She was required to be provided with the actual evidence against her, which may or may not have been included within the voluminous documents she was allowed to review. This evidence is more than sufficient for the jury to find that Ojeda was not provided a sufficient description of the evidence against her in violation of the Due Process clause.

To make matters worse, at trial, Robles, the hearing officer, was unable to state what important aspects of the minor's case Ojeda had allegedly failed to discuss with the social worker. (T. January 30, 2008, p. 121, lines 16–20) He was also unable to state what the necessary elements were for a motion to terminate parental rights. (T. Jan. 30, 2008, p. 122, lines 1–6) Although the jury might have inferred that Robles simply did not remember this information, given the time that had passed since the hearing, it might also have inferred that Robles was not presented with evidence relevant to the two allegations underlying Ojeda's dismissal. If Robles was not provided this evidence at trial, or was unable to understand or describe it as such, then the jury may have seen this as additional evidence supporting Ojeda's testimony that she was not provided with a description of the evidence prior to the pre-termination hearing.

■ In addition to being provided with a description of the evidence, due process requires employers to present employees with an opportunity to present their side of the story. Ojeda presented evidence at trial from which the jury could have inferred that the defendants violated this due process requirement as well. Ojeda requested in writing that the hearing officer issue subpoenas to three witnesses that she wanted to testify at her trial. The hearing officer did not issue any subpoenas; that, however, in and of itself, is not a basis for a federal due process claim. *See Chmielinski,* 513 F.3d at 316 ("The termination hearing is not a court of law, and the same level of process is not required."); *O'Neill,* 210 F.3d at 49 n. 10 ("the Constitution requires only an initial check against erroneous decisions, not that the state follow best practices."). When questioned, however, about his failure to issue the subpoenas, the hearing officer told Ojeda that "he was not going to hear witnesses and that no witnesses were going to be summoned for the hearing." (T. Feb. 1, 2008, p. 114, lines 21–25) The hearing officer's complete refusal to hear witnesses called by Ojeda, under the circumstances of the hearing, could have provided a basis for the jury to find that she was not provided with the opportunity to present her side of the story.[4] *Cf. Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (holding, in the context of a prison disciplinary proceeding, that due process permitted an inmate to call witnesses and present documentary evidence where institutional safety or correctional goals were not compromised).

■ In opposing defendants' Rule 50 motion, Ojeda also argues that evidence of bias on the part of the hearing officer that she produced at trial is yet another basis from which the jury could have concluded that she was not provided with due process. This is a tough claim to state be-

---

4. The hearing officer, after all, relied upon reports issued to him containing the testimony of witnesses hostile to Ojeda. To permit testimony from witnesses that is damaging to Ojeda but not from witnesses who may benefit Ojeda hardly allows her a meaningful opportunity to respond to the allegations against her.

cause there is no requirement that the hearing officer be impartial; in fact, the terminating employer may preside over the hearing. *Acosta–Sepulveda v. Hernandez–Purcell,* 889 F.2d 9, 12 (1st Cir. 1989). Nonetheless, where the decision-maker is "so utterly biased" as to deprive an employee of the opportunity to correct errors of fact, the use of a biased hearing officer can violate due process. *Chmielinski,* 513 F.3d at 318. Ojeda presented evidence that the hearing officer earned his living almost exclusively by working as a hearing officer for government agencies; that the hearing officer's contract with the DOF contains a clause requiring his "absolute loyalty"; that the hearing officer appeared distracted and uninterested to Ojeda during the hearing; that the hearing officer interrupted the hearing three to four times to accept phone calls related to his car radio; that Ojeda was not permitted to present witnesses at the hearing; and that the hearing officer's final report contains no description of the evidence supporting the charges against Ojeda or any evaluation of the evidence presented by Ojeda. It essentially states in conclusory form that Ojeda's dismissal was justified. Drawing only reasonable inferences from the collective circumstances listed above, the Court holds that the fact finder could have concluded that the hearing officer was so biased as to violate Ojeda's due process rights. This interpretation of the evidence may not be the only possible interpretation, but at the Rule 50 stage of analysis the Court may not weigh the evidence or make credibility determinations. It matters only that impermissible bias on the part of the judicial officer is a legitimate inference that can be drawn from the evidence adduced at trial. This is a third type of due process violation that the fact-

finder may have found based upon the evidence at trial.

In sum, the jury may have permissibly concluded, based upon the evidence at trial, that the defendants failed to provide Ojeda with an explanation of the evidence against her, that she was not able to present her side of the story in a meaningful way, and that the hearing officer reviewing her dismissal was impermissibly biased against her. Any one of these permissible inferences require the court to deny defendants' motion for judgment as a matter of law in relation to the due process claim.

## C. Defamation

■ Defamation law is framed within two precepts in the Constitution of Puerto Rico: Article II, Section 4, which provides that "[n]o law shall be made abridging the freedom of speech or of the press;" and Article II, Section 8, which provides that "[e]very person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life." *Osvalda Gonzalez Martinez v. Claudio Lopez,* 118 D.P.R. 190, 18 P.R. Offic. Trans 229 (1987). There are circumstances where the values embodied in these constitutional provisions are in conflict. Defamation cases establish, in essence, the need to balance the citizenry's well-informed interest in encouraging vigorous debate on matters of public interest, and an individual's right to privacy. *Clavell v. El Vocero de P.R.,* 115 D.P.R. 685, 690–91 (1984).

■ In order for a private figure, such as plaintiff Ojeda, to prove defamation under Puerto Rico law, whether it be libel (written) or slander (oral), she must prove the following: (1) that the alleged defamatory statements are false;[5] (2) that the

---

**5.** In their Rule 50 brief defendants briefly suggest that Ojeda did not prove that the statements attributed to Ojeda were false.

The Court disagrees; the jury was entitled to draw inferences favorable to Ojeda's version of events: namely that Ojeda was not negli-

defamatory statements (written or spoken) were negligently made to another; and (3) that the plaintiff suffered damages. *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 6 P.R. Offic. Trans. 581 (1977).

■ In addition to establishing the three elements of a defamation claim, the common law doctrine holding that the defamatory statement must be "of and concerning the plaintiff" applies in Puerto Rico. *Rodriguez v. El Vocero de Puerto Rico, Inc.*, 135 D.P.R. 122, *cert. denied*, 512 U.S. 1237, 114 S.Ct. 2744, 129 L.Ed.2d 863 (1994). Relying on this principle, defendants argue that Zayas cannot be liable for her challenged statements because in those statements she did not single out Ojeda. Ojeda responds that it was clear that Zayas referred to her given additional evidence provided at trial. To evaluate the defendants' claim and plaintiff's response, the Court shall review the "of and concerning" doctrine as it was discussed in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *Rosenblatt v. Baer*, 383 U.S. 75, 81–82, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), and *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986), the three decisions relied upon by the *Rodriguez v. El Vocero* court to elucidate the "of and concerning" doctrine.

In the landmark case of *New York Times Co. v. Sullivan*, the Supreme Court set aside a libel judgment against the newspaper and in favor of a county commissioner. 376 U.S. at 256, 84 S.Ct. 710. The judgment concerned, among other things, a civil rights advertisement that criticized the actions of police in Montgomery, Alabama. *Id.* at 257–58, 84 S.Ct. 710. The statements in the advertisement that the commissioner relied upon as referring to him were that "truckloads of police

ringed the Alabama State College Campus after the demonstration on the State Capitol steps, and that Dr. King had been arrested seven times." *Id.* at 289, 84 S.Ct. 710. The Court determined that the statements "did not on their face make even an oblique reference to [the commissioner] as an individual." *Id.* Therefore the Court looked to the commissioner's witnesses for evidence linking the statements to the commissioner but "none of them suggested any basis for the belief that [the commissioner] himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct." *Id.* Thus, the Court set aside the verdict holding that "an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations." *Id.* at 292, 84 S.Ct. 710.

Although there may have been some doubt after *New York Times* as to whether the "of and concerning" requirement was rooted in Alabama state law or the United States Constitution, *Emerito Estrada Rivera–Isuzu de P.R. v. Consumers Union of United States, Inc.*, 233 F.3d 24, 27 (1st Cir.2000), the Supreme Court clarified the Federal Constitutional roots for the "of and concerning" doctrine two years later in *Baer*. There the Court overturned a damages award against a newspaper columnist and in favor of a former county commissioner in charge of a county ski recreation area in New Hampshire where the challenged statement did not reference the commissioner. 383 U.S. at 77–78, 86 S.Ct. 669. In overturning the award, the Court explained that the district court's instructions to the jury allowed the jury "to infer both defamatory content and ref-

gent in her work, that she was in no way culpable for any perceived or actual errors committed in the minor's case and that she

did not hide or refuse to divulge letters from the minor's family.

erence from the challenged statement itself, although the statement on its face is only an impersonal discussion of government activity." *Id.* at 82, 86 S.Ct. 669. Permitting the jury to find liability merely on the basis of the commissioner's relationship to a government agency, was "tantamount to a demand for recovery based on libel of government, and therefore [was] constitutionally insufficient." *Id.* at 83, 86 S.Ct. 669.

Although these cases could be interpreted as limiting the constitutional bounds of the "of and concerning" doctrine to only cases where libel is directed against government activity, *see Emerito Estrada Rivera–Isuzu de P.R.*, 233 F.3d at 28, it appears that Puerto Rico recognizes the boundary as pushing beyond that by the *Rodriguez v. El Vocero* court's reliance upon *Blatty*. In *Blatty*, an author of a book filed various tortious claims (although not defamation) against the New York Times claiming that the newspaper harmed him by not including his book in the New York Times best seller list. 728 P.2d at 1178–79. The gravamen of all of the claims asserted against the newspaper was that the best seller list was an injurious falsehood of a statement because the newspaper represented that the list was based upon actual sales. *Id.* at 1179. The California Supreme Court held that "the 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." *Id.* at 1183. Because the best seller list did not mention the author or his book, and because it could not reasonably be understood to refer to the author or even a small group to which the author belonged by implication, the author's four claims against the newspaper failed the "of and concerning" requirement. *Id.* at 1185–87.

Unlike in the *New York Times* or *Baer* cases, this is not a case where there was general criticism directed against the government or a government body by someone unassociated with the government. Here, the head of the government agency that is itself at the center of a media hailstorm spoke publicly and effectively placed blame upon certain of her subordinates (conveniently drawing it away from herself and other subordinates) for actions taken by her agency that had come under popular suspicion. Ojeda challenges two statements made by Zayas that were reported in the press. The first occurred on June 14, 2004 when Zayas issued a press release in which she said that "various persons from the Carolina region failed in their duties and obligations in the handling of the Lithuanian boy's case. For this reason I have sent letters to four functionaries announcing the intention to dismiss them." (T. Jan. 31, p. 53) Second, on or about December 13, 2005 Zayas testified at a hearing held by the OCA related to an investigation being carried out by it into the proceedings concerning the minor. (T. Jan. 31, p. 81) Ojeda testified that Zayas was reported as saying at that hearing that "the attorneys hid the letters that came from the grandparents and the mother of the minor and [sic.] requesting the custody of the child." (T. Feb. 1, p. 130) She also testified that the reporters identified "the attorney that was dismissed" as the attorney "who hid the letters from the family of the minor." (T. Feb. 1, p. 130) Zayas testified that she had been misquoted in the press and that she had simply said that some letters had been lost and that they later appeared in the files of the attorneys. (T. Jan. 31, p. 82) In other words, it was the press that linked her statement to Ojeda, not Zayas. This, of course, is the exact problem with both of Zayas's challenged statements; they both concern very small groups of her

own employees and given the circumstances existing at the time of the statements, her statements clearly refer to Ojeda (and a few others).

In the first statement, Zayas literally stated that she intended to dismiss four employees. Ojeda was one of these employees. Although Ojeda was not mentioned by name in the statement, she was one of only two attorneys located in the Carolina office, and she had worked on the minor's case. She was easily identified as one of the employees that Zayas had put on notice of her intent to dismiss her from employment. At the time of the second statement, Ojeda had already been separated from her employment and regardless of that, as stated above, there were only two attorneys in the DOF that worked on the minor's case. Given the overall context of events, both statements clearly referred to Ojeda, as well as to one or a few other employees (depending upon the statement). This is sufficiently "of and concerning" the plaintiff for her to have a viable defamation claim. *Blatty*, 728 P.2d at 1185. And if there were any doubt as to who Zayas was referring to when she made her initial statement she testified at trial that she was referring to Ojeda (and others). (T. Feb. 5, p. 27) Accordingly, the Court finds sufficient evidence to infer that the two contested statements were "of and concerning" Ojeda even though she was not referenced by name in those statements.

**D. Qualified Immunity**

 The qualified immunity doctrine shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights[.]" *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disrup-

tive discovery.'" *Ashcroft v. Iqbal*, ─── U.S. ───, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (quoting *Siegert v. Gilley*, 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring in judgment)). Although the time for avoiding discovery costs is long past over in this case, defendants' reassert their qualified immunity argument.

 There is a two part test for evaluating a qualified immunity claim. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.2009) (citing *Pearson v. Callahan*, ─── U.S. ───, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009)). "Courts must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation." *Id.* (citing *Pearson*, 129 S.Ct. at 815–16). The second part of the test itself has two parts. *Id.* A court must inquire into the clarity of the law at the time of the alleged violation, and then ask if a reasonable official would have understood that her conduct violated the plaintiff's constitutional rights under the particular facts of the case. *Id.; Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

 For the reasons provided in the preceding section discussing plaintiff's due process claim, the Court finds that Ojeda made a sufficient showing of a violation of her due process right to a constitutionally sufficient pretermination hearing. Defendants hardly contest this first prong of the qualified immunity test in their motion and instead focus on arguing that Zayas acted reasonably because she commissioned three investigations and provided Ojeda with a pretermination hearing. Defendants fail to support this argument by providing citations to case law or any other

authority indicating that she provided constitutionally adequate process under the law as it stood on September 3, 2004. This would be difficult, after all, because the rights that Ojeda invoked were clearly elucidated by the Supreme Court in the *Loudermill* opinion issued in 1985, long before Ojeda's hearing. It appears then that defendants are simply asking what more could a reasonable official have done to avoid violating Ojeda's right to due process? The answer, of course, is to provide her with the actual process she was due: an explanation of the employer's evidence against her, and an opportunity to present her side of the story. Anything less than this would have been clearly insufficient to provide Ojeda with an adequate pretermination hearing as required by the due process clause. It was not sufficient simply to give Ojeda a hearing, as defendants appear to argue, even if it was preceded by three investigations. A reasonable officer in Zayas's shoes would know that the function of the hearing was important, and that simply allowing for a hearing devoid of the characteristics laid out in *Loudermill* would be unlawful.

### III. Defendants' motion to alter or amend judgment

■■■ Rule 59(e) governs a court's discretion to alter or amend a judgment. "Rule 59(e) allows a party to direct the district court's attention to newly discovered material evidence or a manifest error of law or fact and enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Aybar v. Crispin–Reyes*, 118 F.3d 10, 16 (1st Cir.1997) (citations omitted). Such "motions are aimed at reconsideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued." *Jorge Rivera Surillo & Co. v. Falconer Glass Indus., Inc.*, 37 F.3d 25, 29

(1st Cir.1994) (quoting *F.D.I.C. v. World Univ., Inc.*, 978 F.2d 10, 16 (1st Cir.1992)).

■■■ Defendants fail to cabin the Rule 59(e) section of their brief within Rule 59(e) jurisprudence. They simply refer to arguments that they raise in another section of their brief. In so doing they fail to direct the Court's attention to newly discovered evidence or any manifest error of law or fact. Because these are the only bases for granting a Rule 59(e) motion, the Court denies their motion as groundless.

### IV. Defendants' motion for a new trial (distinct from *remittitur* )

■■■ Defendants move pursuant to Rule 59(a) for a new trial. The Rule permits courts to grant a new trial on some or all of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1)(A). Motions for new trial may be granted, for example, where verdicts are against the clear weight of the evidence, and—a variation of the this—where verdicts are grossly excessive (relative to the evidence adduced at trial). *See, e.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433–36, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990–91 (1st Cir.1978). "A motion for a new trial is addressed to the sound discretion of the trial court[.]" *Rios*, 575 F.2d at 990. "A district court should order a new trial only when convinced that the clear weight of the evidence so requires, or that a miscarriage of justice would otherwise result." *Consolo v. George*, 58 F.3d 791, 795 (1st Cir.1995) (quoting *Veranda Beach Club Ltd. v. Western Sur. Co.*, 936 F.2d 1364, 1384 (1st Cir.1991)).

■■■ Defendants argue that a new trial is appropriate in this case because the verdict is against the clear weight of the evidence, the damages award was exces-

sive, and because the jury instructions were either "misinterpreted or erroneous." Defendants do not point to any different evidence in the Rule 59(a) section of the brief other than what they pointed to in the Rule 50 section of their brief. The Court already determined that this evidence was sufficient to support the jury's verdict. The Court also agrees with the jury's apparent conclusion that the evidence favorable to finding liability (largely the testimony from Ojeda and Arroyo) tended to be more credible than the testimony that could be construed against finding liability (such as parts of the testimony from Zayas, Colom and Robles). Therefore, the Court rejects defendants' contention that the verdict presented at trial was contrary to the clear weight of the evidence.

 The only new argument raised in this section of defendants' brief is that the Court erred by admitting evidence relevant to Ojeda's dismissal. Defendants believe that this alleged error was then compounded by an additional error committed by the jury. Defendants assert that the only explanation for the verdict and the damages award is that the jury disregarded its instructions regarding the causes of actions, liability, and damages, to find Zayas liable for "illegal dismissal," rather than for a denial of due process and for defamation. The Court finds it impossible to evaluate this argument properly because defendants did not cite to any specific testimony or other evidence that should not have been admitted; they simply state in broad terms that evidence relevant to Ojeda's dismissal should not have been admitted.[6] This assertion, in general terms, is simply incorrect.

Ojeda was terminated from her employment for allegedly making mistakes when she handled the minor's case for the DOF. In stating her case for a constitutional injury she said that she was not provided with proper notice of her pretermination hearing, that she was not made aware of the evidence against her, that she was not provided with a meaningful opportunity to present her side of the story, and that the hearing officer was biased against her. Evidence relevant to each of these aspects of her due process claim necessarily also relates to the veracity of the rationale put forward by the DOF for terminating Ojeda from her employment. Therefore, the Court rejects defendants' claim that evidence relevant to Ojeda's dismissal was not relevant to her due process claim. Although defendants do not expressly argue that evidence relevant to Ojeda's dismissal was more prejudicial than relevant, the Court conducted the prejudice versus relevance balancing act on its own and found, at least at the general level at which defendants present their argument, that evidence relevant to Ojeda's dismissal must be admitted for its relevance despite its sometimes prejudicial character. Accordingly, the Court rejects defendants' contention that it erroneously admitted evidence relevant to Ojeda's dismissal.

The defendants' contention that the evidence presented did not support the damages award shall be discussed in the following section.

## V. Defendants' motion for *remittitur*

### A. Compensatory Damages

 A party requesting *remittitur* "bears the heavy burden of establishing

---

6. The Court notes two more points that are detrimental to the defendants' position: (1) defendants participated in the charging conference which resulted in the instructions that were provided to the jury; and (2) defendants have cited no legal authority for the assertion that certain evidence was improperly admitted or that the jury deviated from its instructions.

that an award is grossly excessive, inordinate, shocking to the conscience of the court or so high that it would be a denial of justice to permit it to stand." *Havinga v. Crowley Towing and Transp. Co.*, 24 F.3d 1480, 1484 (1st Cir.1994). A reviewing court will not "disturb an award of damages because it is extremely generous or because [the court] think[s] the damages are considerably less." *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir.1999). Rather, the court will "adhere to the jury's judgment unless the damages awarded are 'so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law.'" *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 144 (1st Cir.2009) (quoting *Koster*, 181 F.3d at 34).

▮ Defendants argue that the $150,000.00 awarded to Ojeda for her due process claim and the $350,000.00 awarded to her for her defamation claim are unsupported by the evidence presented at trial. Defendants argue, again without citing legal authority, that the lack of non-testimonial evidence concerning damages make the award excessive.[7] The Court disagrees, finding that Ojeda presented sufficient evidence to support the compensatory damages awards. Although the compensatory awards in this case may be generous, the Court cannot go so far as to say that they are so grossly disproportionate to the evidence of injury as to be unconscionable as a matter of law.

Both Ojeda and Arroyo provided testimony supporting the jury's findings as to Ojeda's damages. These damages included (1) economic damages such as lost wages and benefits; (2) noneconomic damages such as emotional distress and mental anguish; (3) physical symptoms such as insomnia and weight loss; as well as (4) harm to Ojeda's good name, reputation and honor (cognizable in Puerto Rico for a defamation claim). Defendants, on the other hand, presented no testimony (or other evidence) to rebut Ojeda's evidence of damages.

Ojeda testified that once she received her letter of intent to dismiss on June 28, 2004, she felt "upset" because she did not understand the basis for the purported findings in the letter. (T. Feb. 1, p. 103) She felt angry and frustrated. (T. Feb. 1, p. 106) To paraphrase, she felt indignant because rather than being rewarded for single handedly carrying out the duties of the Carolina Legal Division of the DOF over a period of approximately two months, she was falsely accused of performing negligently and relying upon false statements. (T. Feb. 1, p. 106) During the pretermination hearing itself she felt very frustrated because the examining officer "seemed distracted" and not "interested" in her side of the story. (T. Feb. 1, pp. 116–18)

Ojeda became physically distraught on the stand when asked to describe how she felt after receiving her dismissal letter on December 23, 2004. She testified that she felt frustration, great rage and concern over how she would care for her daughter. (T. Feb. 1, p. 121) She went on to testify as follows:

> Well, it affected me deeply. I mean, you're in—in this situation that's been

---

7. Defendants literally assert that no "testimonial evidence was presented by the plaintiff regarding any treatment by psychologists or psychiatrists." (Docket No. 105, p. 28) This is untrue; Ojeda herself testified that she went to visit a psychologist named Rachel Rojas on three occasions. (T. Feb. 1, pp. 123–24) The Court presumes that the defendants may have intended to point out that Ojeda did not present expert testimony as to her emotional distress damages. Such expert testimony is not necessary, of course, but its absence may be useful for comparing an award to awards in other cases. *Koster*, 181 F.3d at 35.

mentioned for months. Your name is in the press. I mean, horrible things are being said about us and me specifically. And on the radio. And this is—it's not only me that's hearing this, but my parents. They're elderly people. They're very upstanding people, and they have to hear things like this. So it was everything ... it wouldn't let me sleep. I would fall asleep at 2:00 in the morning. And my eyes at 4:00 in the morning would be wide open ... I lost weight, and it was ... a very difficult time. And it was a period of constant despair. I couldn't ... rest. At that time, I started visiting a psychologist, but when I got the dismissal letter, my health benefits disappeared with that. So facing that situation, then I didn't have the luxury of paying a psychologist, so I—I had to stop seeing the psychologist.

(T. Feb. 1, pp. 122–23)

Much of Ojeda's testimony was corroborated by Arroyo who testified that Ojeda "lost weight," "wouldn't eat," and "wouldn't sleep" after receiving the dismissal letter. (T. Jan. 28, pp. 46–47)

When asked how her dismissal affected her financially Ojeda testified as follows:
Well, I think that still today I'm feeling the effects of the dismissal, because, obviously, I stopped generating income. And I was the only—the only one in my home that generated income. So you start getting behind on the rent, on the school of my daughter—it's a private school—and they have a—if you don't pay, they—by—at the end of the semester they have their mechanisms so you can't request your child's grades. So your landlord calls you, and then when you continue to take calls, and then the phone is disconnected because you can't pay for those services, and you obviously have to start making priorities. I mean, if the electric bill is behind two months, then this month you pay the electric bill;

you don't pay the phone bill ... And at a certain point, my sister started helping me, but she also has her financial commitments, so I can't expect her to be responsible for all the things that I'm responsible for in my home.

(T. Feb. 1, pp. 124–25)

Again, Arroyo corroborated much of Ojeda's testimony, stating that Ojeda's sister paid for Ojeda's daughter's school and for "everything." (T. Jan. 28, p. 47)

Ojeda also testified that when she was separated from her employment with the DOF she was earning approximately $2,800.00 to $2,900.00 a month. (T. Feb. 1, p. 125) She said that after about one to two months of looking for a job, she began a professional relationship with another attorney. (T. Feb. 1, p. 127) Initially she worked just a few hours for this attorney. (T. Feb. 1, p. 127) After four to five months Ojeda reached an agreement with this lawyer pursuant to which she was paid $3,000.00 a month but she was not provided with any health insurance or other benefits. (T. Feb. 1, p. 126) This working relationship lasted until approximately July, 2007 at which time it ended because that lawyer faced "cash flow problems." (*Id.*) Since then Ojeda has been trying to build her own practice as a lawyer but has been facing "a very uphill battle." (*Id.*)

Lastly, Ojeda testified that she read an newspaper article in which a reporter stated that Zayas testified at a hearing and accused Ojeda of hiding letters written by the minor's mother and grandparents. (T. Feb. 1, p. 130) She said that upon reading this article she felt "frustration and rage." (*Id.*) She said that Zayas statement was a "bald faced lie" and that it harmed her integrity, good name and her professional reputation. (T. Feb. 1, p. 130–31)

This testimony certainly supports a finding of substantial economic and non-economic damages. Though the jury's allot-

ment of compensatory damages may be thought generous by some, those damages are not so significantly out of line with other damages awards that have passed appellate muster so as to suggest that the compensatory damages in this case are unconscionable as a matter of law. *See Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico,* 554 F.3d 164, 174–75 (1st Cir.2009) (upholding an award of $333,000.00 pursuant to Title VII and local Puerto Rico laws where plaintiff testified that she endured sexual harassment for several months, that she suffered from depression, and insomnia); *McDonough v. City of Quincy,* 452 F.3d 8, 22 (1st Cir.2006) (upholding an award of $300,000.00 where plaintiff testified of damage to his reputation, substantial humiliation, emotional instability, and a deteriorated relationship with his family); *Valentin–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 102–03 (1st Cir. 2006) (upholding an award of $705,000.00 where there was evidence of "serious economic damages" and where the plaintiff "suffered from various forms of emotional damages and mental anguish, including, *inter alia,* insomnia, anxiety, guilt, and depression."); *Rodriguez–Torres v. Caribbean Forms Mfr., Inc.,* 399 F.3d 52, 63–64 (1st Cir.2005) (upholding a $250,000.00 damages award in a gender-motivated discharge case based upon plaintiff's own testimony where plaintiff testified that her life changed drastically, she entered a deep depression that lasted "for quite some time," her marriage suffered, and she had trouble finding subsequent employment); *Hogan v. Bangor & Aroostook R.R.,* 61 F.3d 1034, 1037–38 (1st Cir.1995) (reinstating a compensatory damage award of $200,000.00—the maximum allowable under the damages cap—for emotional distress, inconvenience, mental anguish and loss of enjoyment of life in an ADEA case). Therefore, the Court rejects defendants'

request for *remittitur* in relation to the compensatory damages part of the award.

## B. Punitive Damages

■■■■■ Punitive damages may be awarded pursuant to 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). "Such indifference 'pertains to the defendant's knowledge that [she] may be acting in violation of federal law.'" *DiMarco–Zappa v. Cabanillas,* 238 F.3d 25, 37 (1st Cir.2001) (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). The "guiding inquiry" is whether the defendant "acted in the face of a perceived risk that [her] actions will violate federal law," although "egregious or outrageous acts" may also support an inference of the requisite evil motive. *Id.* at 38 (*Kolstad,* 527 U.S. at 536, 538, 119 S.Ct. 2118). In the context of a section 1983 false arrest claim, the difference in state of mind necessary to support a cognizable claim versus that necessary to support punitive damages has been described as the intent to do the act, versus the intent to effect a civil rights violation. *Iacobucci v. Boulter,* 193 F.3d 14, 26 (1st Cir.1999). Plaintiffs may prove that a defendant was aware of the risk of violating federal law through circumstantial evidence. *Mendez–Matos v. Municipality of Guaynabo,* 557 F.3d 36, 49 (1st Cir.2009) (*Iacobucci,* 193 F.3d at 27).

■■■■ The evidence put forward by Ojeda supports the inference that Zayas acted with an evil motive and that she acted in the face of a perceived risk that her actions would violate federal law. As a starting point for analysis, certain circumstantial evidence allowed the jury to con-

clude that Zayas was aware of the risk. First, a substantial body of federal law exists concerning the protections due to an employee as part of a pretermination hearing, beginning with the *Loudermill* opinion. *See Mendez–Matos,* 557 F.3d at 49 (citing *DiMarco–Zappa,* 238 F.3d at 38) (explaining that the existence of an extensive body of law on a particular issue suggests that the defendant must have been aware of the risk of violating that law). Second, Zayas was the Secretary of the Family. She testified that in her position she had so many employees who had complaints filed against them that she could not review the personnel files of employees facing disciplinary proceedings, such as Ojeda. (T. Jan. 31, pp. 149–50) Given her position as the ultimate decision-maker for disciplinary proceedings, and the frequent occurrence of disciplinary proceedings against employees of her agency, she should have been quite familiar with the due process protections due to her employees. *See Mendez–Matos,* 557 F.3d at 49 (citing *Powell v. Alexander,* 391 F.3d 1, 20 (1st Cir.2004)) (explaining that in light of a defendant's occupation he should have been aware of the risk of violating the plaintiff's constitutional rights).

In addition to presenting evidence suggestive of Zayas's awareness of the risk of violating Ojeda's due process rights, Ojeda also presented evidence from which the jury could infer that Zayas acted with evil intent. Zayas testified that she first learned of the minor's case in December, 2003. Nonetheless, she also admitted to speaking with Judge Ramos concerning the minor in December, 2002. She also spoke with Judge Ramos concerning the minor several times in the year that followed. From this testimony, the jury could have inferred that Zayas actually learned of the details concerning the minor's case long before December, 2003, and the jury could have even inferred that

Zayas was not entirely forthcoming with her testimony concerning her involvement in the minor's case. This last inference could also be drawn from other evidence submitted at trial.

For example, a letter dated January 14, 2003 was sent to Zayas from the Puerto Rico Department of State concerning the minor's case. Zayas testified that she did not receive the letter and that it must have been handled by one of her aides. The jury could have discounted her denial and instead understood the evidence to be suggestive of her knowledge of and involvement in the minor's case.

Evidence adduced at trial also suggests that Colom, the DOF's legal counsel whose office was located at the "central" level with Zayas, was heavily involved in the minor's case. Although she denied receiving it, a detailed report dated July 22, 2003 concerning the social aspects of the minor's case was addressed to Colom. The jury could have disbelieved Colom's testimony that she did not receive the report. The jury could also have credited testimony from Ojeda and Arroyo that Colom instructed them to file the termination of parental rights petition and that Colom even arranged for a driver to take the petition to the Superior Court in Fajardo to be filed. Rather than believing that Colom became involved in the minor's case on her own accord, something she did not routinely do with cases arising in Carolina, the jury could have inferred that Colom was in fact acting at Zayas' express direction.

The jury might have also found suspicious the fact that no one at the "central" level was disciplined or even seriously investigated in the wake of the minor's return to his grandparents in Lithuania. Colom for example, who the jury could have believed directed Ojeda and Arroyo to act, was interviewed but was not found

to have been at fault, although Ojeda testified that it was Colom who told her to file the petition to terminate the minor's parental rights. In explaining why Colom was not found to be at fault, Zayas stated that Colom could not have been disciplined because she had already resigned her position. This answer could have been seen as prevarication by the jury because Colom obviously could still have been found to be at fault by the internal departmental investigation(s) even if she no longer worked there; she simply could not have been disciplined. Indeed, the jury could have inferred that Colom's resignation came about precisely to avoid being disciplined.

Thus, the jury could have looked at numerous sorts of circumstantial evidence to conclude that despite her protestations to the contrary, Zayas was knowledgeable about, and even involved in, the minor's case long before December, 2003. Thus the jury could view her discipline of Ojeda as intentionally placing blame upon Ojeda and a few other junior people in a regional office to deflect attention from her own involvement and that of members of her central administration (like Colom) in the minor's case. This amounts to acting with an evil motive.

■■■ A finding that the evidence permits the inference that the defendant acted with evil motive and with an awareness of the risk of violating federal law, however, does not end the court's inquiry into punitive damages. The Court must also evaluate if the damages awarded in this case violate the Due Process Clause of the Fourteenth Amendment which limits "grossly excessive" punitive damages. *Mendez–Matos*, 557 F.3d at 47 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–17, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). There are three guideposts for evaluating whether a punitive damages award is grossly excessive: (1) the degree of the reprehensibility of

the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418, 123 S.Ct. 1513; *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Mendez–Matos*, 557 F.3d at 52.

■■■ The Supreme Court has identified the first guidepost, degree of reprehensibility of the defendant's conduct, as the most important indicium of the reasonableness of a punitive damages award. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. To evaluate the reprehensibility of a defendant's conduct courts must consider "whether[ ] the harm caused was physical as opposed to economic; [whether] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery or deceit, or mere accident." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589).

■■■ Most of the factors identified by the Supreme Court play no role here. The harm suffered by Ojeda was economic and emotional in nature but not physical. Although Ojeda did testify to weight loss and insomnia, these arguably physical ailments are not the type of physical harm that the Supreme Court seems to be concerned about; that type of harm involves the presence or threat of violence. *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589; *Mendez–Matos*, 557 F.3d at 53. The bare fact that the harm was economic in nature, however, does not in and of itself discount

the reprehensibility of Zayas' conduct. The infliction of economic injury when done intentionally through affirmative acts of misconduct or when targeted at a financially vulnerable person may warrant a substantial penalty. *Gore,* 517 U.S. at 577, 116 S.Ct. 1589. Here economic harm was a natural consequence of terminating Ojeda from her employment, but it cannot be said that it was intentionally done in the way in which a tortfeasor may defraud a victim of something of value. *See, e.g., TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 453, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). It could also be said that Ojeda was financially vulnerable given that she was the sole breadwinner for her daughter and her life partner who was unable to work. Ojeda was not targeted for this reason, however; she was targeted, so to speak, because she did file the petition to terminate parental rights in the minor's case.

Another factor is whether the defendant's conduct "evinced an indifference to or a reckless disregard of the health or safety of others." As mentioned above, Ojeda's health and safety were not put in immediate jeopardy by the violation of her right to due process. If this concept were adapted to the "constitutional tort" context from the traditional tort context in which it evolved, then the court could ask whether Zayas's conduct evinced an indifference or reckless disregard of Ojeda's right to due process. The answer to this question is a resounding yes.

The question of whether the conduct involved repeated actions or was an isolated incident could also use some adaptation. There is no allegation in this case that Ojeda's due process rights were violated more than once in the "botched" pretermination hearing. There is also no allegation that other employees had their due process rights violated. The inference may be drawn, however, that five other employees were also singled out for discipline (whether they deserved it or not) to deflect attention from the involvement in the minor's case of those who labored in the central office.

Lastly, the jury could have inferred that the harm that resulted here was the result of trickery or deceit. Zayas denied involvement in the minor's case until December 2003. Neither she nor anyone in the central office were targeted in the investigation that followed the minor's return to his grandparents, nor was she nor anyone close to her found to be culpable in the reports that she commissioned. Nonetheless, Ojeda produced significant circumstantial evidence from which the jury could infer that Zayas and those around her were involved in the minor's case and that they attempted to hide their involvement. The jury could have inferred that Zayas's method for hiding her involvement and those of the "central office" was to deflect attention onto Ojeda and other junior employees of the Carolina branch. This "scapegoating" of Ojeda and others is both a form of trickery and deceit.

In sum, the various factors relevant to weighing the reprehensibility of Zayas's actions present a somewhat muddled picture. On the one hand, the lack of physical harm certainly lessens the relative reprehensibility of the conduct. On the other hand the jury could have inferred that the harm done was the result of deceit and that it indicated an indifference or reckless disregard to Ojeda's due process rights. On the whole, the Court finds that Zayas's conduct was sufficiently reprehensible to merit a punitive damages award, but not so highly reprehensible as to merit the extremely large amount of punitive damages awarded by the jury.

Pursuant to the second guidepost, courts ask whether punitive damages bear a reasonable relationship to the harm

that the defendant's conduct caused or is likely to have caused. *Gore,* 517 U.S. at 581, 116 S.Ct. 1589. While "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process, *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513, there is no simple mathematical formula that marks the constitutional line. *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. Low awards of compensatory damages may properly support a higher ratio than high compensatory awards if a particularly egregious act has resulted in only a small amount of economic damages. *Id.* A higher ratio may be justified in cases where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. *Id.* When compensatory damages are substantial, however, "then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

In this case, the jury awarded Ojeda $150,000.00 in compensatory damages for her procedural due process claim. The jury awarded Ojeda another $350,000.00 in compensatory damages for her defamation claim. The $1,000,000.00 that the jury awarded to Ojeda in punitive damages is 6.67 times greater than the compensatory damages awarded for the due process claim. (Pursuant to Puerto Rico law punitive damages are not available for Ojeda's defamation claim; therefore the court calculates the ratio by comparing the punitive damages only to the due process compensatory damages.) Although the punitive award is within the relative safe zone of a single digit modifier, this Court finds it to be unreasonable because Ojeda was already amply (but not excessively) compensated by the compensatory damages awarded in this case. *Cf. Mendez–Matos,* 557 F.3d at 55. Moreover, the compensatory damages in this case were likely intended to compensate Ojeda in part for

her outrage and humiliation, components that may have been duplicated in the punitive award. *See Campbell,* 538 U.S. at 426, 123 S.Ct. 1513. This analysis supports a one-to-three ratio, or an award of $500,000.00 as the most appropriate punitive damage award. This determination does not end the inquiry, however, as there is a third guidepost.

The third guidepost directs the Court to consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513. Because Congress did not address damage awards in the case of section 1983 claims, First Circuit courts compare the present award with awards that have been permitted in similar section 1983 suits. *Mendez–Matos,* 557 F.3d at 55. As compared with other section 1983 cases in the First Circuit, the jury's $1,000,000.00 punitive damages award is high. Other cases in which similar or greater punitive damages were awarded involved violence and significant physical injury. See *Casillas–Diaz v. Palau,* 463 F.3d 77, 80, 86 (1st Cir.2006) (upholding a jury's total punitive damage award in an excessive force claim of $1,000,000.00 divided among four separate defendants); *Davis v. Rennie,* 264 F.3d 86, 94 (1st Cir.2001) (upholding a total punitive damages award in an excessive force claim of $1,025,000 apportioned among various defendants). Relatively "large" punitive awards in non-violent cases in which there was still a significant element of intentional or malicious conduct are of a magnitude less than $1,000,000.00. See, e.g., *Rivera–Torres v. Ortiz Velez,* 341 F.3d 86, 102 (1st Cir.2003) (affirming a punitive damages award of $250,000.00 in a case of political discrimination arising under section 1983); *Zimmerman v. Direct Fed. Credit Un.,* 262 F.3d 70, 83 (1st Cir.2001) (affirming an award of $400,000 for violations of state

anti-discrimination law); *Romano v. U–Haul Intern.*, 233 F.3d 655, 672–73 (1st Cir.2000) (upholding an award of $285,000.00 for violations of Title VII and state law). Thus, under the third guidepost the jury's punitive damage award appears disproportionately large.

After applying the three *Gore* guideposts, the Court finds that the jury's punitive damage award of $1,000,000.00 exceeded what was reasonably necessary to punish and deter Zayas' conduct. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 14 n. 11 (1st Cir.1999). In due process parlance, Zayas lacked fair notice that her conduct could expose her to a penalty of this magnitude. *Gore*, 517 U.S. at 574, 116 S.Ct. 1589; *Mendez–Matos*, 557 F.3d at 56. Therefore, the Court reduces Ojeda's punitive damage award to $500,000.00. The Court believes that this amount reasonably reflects the degree of reprehensibility of Zayas' conduct. It also represents a 1 to 3 ratio between compensatory and punitive damages, a ratio that is often appropriate in a case such as this one. Lastly, it is similar to the limits of the amounts affirmed by the First Circuit Court of Appeals for egregious cases of non-violent conduct.

## VI. Attorneys Fees

Ojeda has filed a motion requesting that the Court exercise its discretion to award her attorney's fees and costs as the prevailing party in this matter. Rather than oppose Ojeda's motion on the merits, the defendants argue that Ojeda's motion for attorney fees and costs should be stayed. Local Rule of Civil Procedure 54 provides as follows:

> An application for attorneys' fees in those cases in which fees have been contracted for or in any case in which no notice of appeal has been filed shall be filed within forty-five days of entry of judgment.

> An application for fees in all other cases shall be filed within thirty days of the disposition of the appeal. A claim for fees filed before the final disposition of any appeal shall have no effect and a new application must be filed within the time prescribed herein.

Loc.Civ.R. 54.

The last sentence of this rule directs that claims for fees filed before the final disposition of any appeal shall have no effect and it requires a new application for fees once the Court of Appeals disposes of the appeal. This sentence read at face value voids any application for fees filed within forty five days of judgment. If the court allowed the first sentence to trump the third, however, then it would create a perverse incentive for a prevailing party to race to file an application for fees before the losing party files its notice of appeal. It would also undermine one of the apparent purposes of the rule, ensuring that a trial court does not rule on a request for an award of attorneys' fees until after the Court of Appeals decides any challenges to the underlying claims.

Therefore, the Court **DENIES** Ojeda's application for attorneys' fees and costs **WITHOUT PREJUDICE**. Instead, the Court invites Ojeda to submit a new application for attorneys' fees no later than thirty days after the disposition of an appeal in this case (if she prevails), or if no appeal is filed following the Court's disposition of the defendant's Rule 50 motion, then within thirty days of the date on which the defendant's right to appeal expires.

## VII. Conclusion

For the foregoing reasons, the Court **DENIES WITH PREJUDICE** defendants' motions pursuant to Rule 50, Rule 59(a), Rule 59(e), and defendants' request for *remittitur* of the compensatory dam-

ages awards (Docket No. 105). The Court **REDUCES,** however, Ojeda's punitive damages award from $1,000,000.00 to $500,000.00. The Court also **DENIES WITHOUT PREJUDICE** Ojeda's application for attorney's fees (Docket No. 99) and **DENIES as MOOT** defendants' motion to stay (Docket No. 100).

**IT IS SO ORDERED.**